BERIC T. USHER  
GREAT LAKES INSURANCE vs CRABTREE

October 27, 2021  
17–20

Page 17

1  after your deposition and the documents that I
2  believe are in route, that you don't have any
3  additional documents that would be responsive to
4  Addendum A to your first deposition or Addendum A to
5  the continued deposition in this case?
6      MS. GOLDMAN:  Objection.  These documents
7  are not being produced in response to the subpoena.
8  Whether he has them or not is irrelevant.
9      MR. NEBLETT:  Well, they were requested
10  initially in his first deposition.  They've been
11  requested again.  I just want to see --
12      MS. GOLDMAN:  That one wasn't served
13  properly either.
14  BY MR. NEBLETT:
15      Q.  Okay.  Sir, do you have any more
16  documents, especially since now we've had over a year
17  that's passed, that may be responsive to various
18  requests in this case?
19      A.  Over a year response?  I believe it's --
20  since my last deposition?
21      Q.  March?
22      A.  Yeah.  March 2021, though.  Wasn't it?
23      Q.  Okay.  So six months?
24      A.  Six months.  Yeah.  Let me see.  I've had
25  in invoice from Alexander -- Arnold and Arnold.  That

Page 18

1  was on the 13th of September, 2001 -- 2021.  The rest
2  is all correspondence between ourselves and our
3  attorney.
4      Q.  Well, I would ask that you could please
5  produce the invoice for Arnold and Arnold.  I do not
6  want any correspondence between you and your counsel.
7      MS. GOLDMAN:  David, I sent you the
8  underwriting manual and the rating guide.
9      MR. NEBLETT:  Thank you.  And Madam Court
10  Reporter, what I'd like to do is to go ahead and
11  attach as, I guess, 2 and 3, the Concept Special Risk
12  rating guide, and 3 is the Concept Special Risk
13  underwriting manual.
14      (Defendant's Exhibits 2 and 3 were marked
15  for identification.)
16      THE REPORTER:  Okay.
17      THE WITNESS:  The Arnold and Arnold
18  invoice has been sent.
19  BY MR. NEBLETT:
20      Q.  Thank you, sir.  Sir, what I've put up on
21  the screen is what was sent to me as the Concept
22  Special Risk rating guide.  Can you just generally
23  explain to the ladies and gentlemen of the jury what
24  this document is?
25      A.  Yes.  It's an internal document that is

Page 19

1  used by my underwriting team as guidance on what
2  rates to apply.  It is not a filed document.  There
3  is no constraint to it to abide by that document.
4  But it is to give an indicator, both to my
5  underwriters and, indeed, to our principle, Great
6  Lakes, as to what our rating criteria will normally
7  be.
8      Q.  And is this a document that's provided to
9  agents or brokers, such as Burns and Wilcox?
10      A.  Absolutely not.
11      Q.  And would this document help you price
12  the premiums for a risk such as a yacht?
13      A.  It would assist my underwriters to assess
14  the premium, yes, in part.  In addition to this,
15  there is a matrix which show the base whole rates,
16  depending on the type of vessel, which is built into
17  the computer system.  So, this rate guide amends the
18  basic matrix.
19      Q.  And is there any navigational or
20  territorial limit or determination on this particular
21  rate sheet?
22      A.  There is a locational aspect whereby
23  where the vessel is primarily going to be located.
24  And then there are also other navigational, whereby
25  the vessel is going on an extended voyage.

Page 20

1      Q.  And I'm sort of looking at a little bit
2  of it now.
3      A.  Do you see that, location loading?  Move
4  up a bit.  Up a bit.  There.  You see, location and
5  loading, debits and credits.  So that determines
6  where the vessel is going to be primarily during the
7  windstorm season.
8      Q.  And can you explain, then, and I don't
9  know if I can highlight this.  But what this would
10  mean, a "Debit/credit plus-40 for Florida/West Palm
11  Beach to Naples"?
12      A.  Correct.  That means if the vessel is
13  primarily located in that area during the windstorm
14  season, it is the basic matrix for that style of
15  vessel plus 40 percent.
16      Q.  And so, that would be 40 percent?  When
17  it says, "plus-40," that would be a percentage?
18      A.  Correct.
19      Q.  And I note here you have a section for
20  vessels under repair.  Why is that important, if it
21  is important?
22      A.  This is, again, telling them how to rate
23  the vessel.  If the vessel is under repair, then
24  there are specific clauses that they have to use.
25  For example, the unrepaired damage clause.  And



Page 45

1  THE WITNESS: Okay. Mr. Neblett, I'll
2  send a copy of the brokers' manual, which is issued
3  to the brokers that we deal with. And that addresses
4  the survey issue. This is, therefore, an external
5  document, whereas all the other documents that we've
6  been looking at purely internal documents.
7       MR. NEBLETT: And sir, are there any
8  other documents that are responsive to the subpoena
9  duces tecum or that have any bearing on this case,
10 coverage, compliance, underwriting, for the
11 Crabtrees?
12      MS. GOLDMAN: Objection. Objection. And
13 I'm going to instruct Mr. Usher not to produce
14 anything further, as this subpoena was not served
15 properly.
16 BY MR. NEBLETT:
17    Q. You can answer, sir.
18    A. As I said earlier, not that I'm aware of.
19      MR. NEBLETT: And Ms. Goldman, did you
20 also send this to the court reporter?
21      MS. GOLDMAN: Yes. I did.
22      MR. NEBLETT: Madam Court Reporter, I'd
23 like to go ahead and mark as Defendant's 5 the
24 Brokers Manual.
25      (Defendant's Exhibit 5 was marked for

Page 46

1  identification.)
2  BY MR. NEBLETT:
3     Q. And sir, getting back to the underwriting
4  manual, there is nothing whatsoever in the
5  underwriting manual as to the tiny note providing any
6  documentation, is there?
7     A. No. As I said, it's dealt within the
8  administration, Brokers Manual, and of course they're
9  already aware of it, which is why the underwriter put
10 the survey requirement on the indicated terms.
11    Q. Is there any -- go on.
12    A. If you look at the Brokers Manual that
13 has just been sent, the relevant section is on page
14 5. Any surveys, where we state, "Vessels over 5
15 years old require a current condition valuation
16 survey. If possible, the survey should be provided
17 with the quote submission. Underwriters may not be
18 able to quote vessels over 25 years of age -- or 25
19 years old where the quote submission is not
20 accompanied by an acceptable survey."
21    Q. And that's, again, not in your
22 underwriting manual. That's in a separate document
23 that you also just produced?
24    A. That's in the Brokers Manual, a guideline
25 to the brokers that we provide as to the way we

Page 47

1  operate.
2     Q. And is there anything in the
3  underwriter's manual as to the timing of binding a
4  policy?
5     A. The timing of binding a policy?
6     Q. That may have been a bad question. Let
7  me ask a more specific question. Is there anything
8  in the underwriting manual as to a temporary binder?
9     A. No. That's an administrative issue.
10    Q. Is there anything in the underwriting
11 manual as to converting a temporary binder into a
12 full policy?
13    A. No. That's all administrative issues.
14 The underwriting manual is designed to assist the
15 broker and determine the acceptability of the risk
16 and the rates to -- along with the rate guide, the
17 rates to charge.
18    Q. Wait. I thought you told me that the
19 underwriting manual was something that you use as an
20 underwriting agent and is not produced to the
21 brokers?
22    A. No. We don't produce the underwriting
23 manual or the rate guide to the brokers. We do
24 produce the broker manual to the brokers purely,
25 simply, because that is to provide guidance to the

Page 48

1  broker as to the way we operate. That tells them the
2  issue with surveys, but also how to bind a risk, what
3  the binding procedures are, what a temporary binder
4  is as opposed to a policy document, what the timings
5  are, what the flow charts are. Everything to do with
6  transacting business with us.
7     Q. And I believe that this document is dated
8  November 2014. Is that the most recent version of
9  this document?
10    A. No. There are more recent ones, but
11 after this incident.
12    Q. And what is the most recent one?
13    A. There was one dated March 2021.
14    Q. And I would ask that you provide that
15 document as well.
16    A. I think I've been instructed not to
17 provide you with any further documents.
18    Q. Counsel can make an objection, but I'm
19 asking that you produce that document as well.
20      MS. GOLDMAN: Objection.
21      MR. NEBLETT: So then, are you refusing
22 to provide the most recent -- let me just come up
23 with the exact name, Business Manuals for Concept
24 Special Risk?
25      MS. GOLDMAN: Tony, if you have the most



Page 49
1  recent, that would be all right.  I doubt it's very
2  different.
3       THE WITNESS:  Almost --
4       MS. GOLDMAN:  Nothing further --
5       THE WITNESS:  I will send it --
6       MS. GOLDMAN:  -- will be produces.
7       THE WITNESS:  -- through.  I haven't put
8  any verbiage on it.  Jackie, I've just sent it.
9  BY MR. NEBLETT:
10     Q.  This document, which we've marked as
11  Defendant's 5, indicates that there is an attached
12  Zip file.  Did you produce the attached Zip file?
13     A.  I have got it.  I found a Zip file, but
14  it's not -- because it's got old policy manuals in
15  it.  So, it would have been just updated with the new
16  policies since they came out.
17       MS. GOLDMAN:  Plaintiff will not be
18  producing anything further.
19       MR. NEBLETT:  Well, I just note that
20  there is a number of sections here where it says,
21  "Within the Zip file.  Within the Zip file."  So I
22  believe that would be part of this document.  But we
23  have not been provided the Zip file.
24       MS. GOLDMAN:  If it wasn't attached, then
25  it's not being produced.

Page 50
1       MR. NEBLETT:  Okay.  Well, I'd like to
2  specifically request that Zip file, which I have.
3       MS. GOLDMAN:  Okay.  Discovery ends
4  tomorrow.  You can take it to the judge.
5       MR. NEBLETT:  Okay.  So are you refusing
6  to provide the Zip file, which is attached to this
7  document, and incorporated therein?
8       MS. GOLDMAN:  It's not attached.  That's
9  what I'm telling you.
10      MR. NEBLETT:  Well, it says, "The
11  attached Zip file."  But I'm just seeing this for the
12  first time.  It says, "The attached Zip file.  For
13  use, reference the Zip file."  I don't know what's in
14  the Zip file, but it certainly says that it's a part
15  of this document.
16      MS. GOLDMAN:  Well, it isn't.  So it's
17  not being produced.  Are you familiar with Rule 34?
18      MR. NEBLETT:  Are you familiar with
19  obstructing discovery and not responding to discovery
20  and subpoena duces tecum?
21      MS. GOLDMAN:  Take it to the judge,
22  David.
23      MR. NEBLETT:  Okay.
24      MS. GOLDMAN:  You're running up on about
25  halfway through your time, by the way.

Page 51
1       MR. NEBLETT:  Good luck with that one.
2  Maybe if these documents were produced prior to the
3  deposition, that would have been helpful.
4       MS. GOLDMAN:  Yeah.  When?
5       THE WITNESS:  I can tell you that the
6  only things that were in the Zip file are, for
7  example, the policy wordings, the application forms,
8  the standard letter of compliance forms, all the
9  forms that are referred to in the business manual.
10 BY MR. NEBLETT:
11     Q.  I appreciate that, sir.  Thank you.  Sir,
12  I know on page 5 that there is reference to a receipt
13  of assigned broker of record letter.  What would that
14  be?
15     A.  That -- we only require that if we have
16  already quoted the risk or if we already write the
17  risk, and the broker is going to change.  So every
18  now and then, you will get a submission from two
19  separate brokers.  We will quote to the first broker,
20  but we will not release the terms to the second
21  broker unless they obtain a broker record letter,
22  which is an appointment that has to be signed by the
23  insured appointing someone as the broker of record.
24     Q.  And this document that's called a Brokers
25  Manual, this wasn't provided to the Crabtrees.  Was

Page 52
1  it?
2      A.  No.  It's for a broker.  So it would have
3  been provided to a broker that we deal with, i.e.,
4  Burns and Wilcox.
5      Q.  And do you know if this document was
6  actually provided to Burns and Wilcox, or Mr. Little,
7  or the agents on this particular policy or binder?
8      A.  Well, it would have only been to Burns
9  and Wilcox because we only deal with Burns and Wilcox
10 as far as this particular risk.  Obviously, we deal
11 with numerous brokers, but only brokers that we deal
12 with directly do we issue a Brokers Manual.  I don't
13 believe we keep a record of every time we send them
14 out because Burns and Wilcox has been approved for
15 many years.  I don't know how far back our archives
16 would go to evidence that we sent it, but you can
17 also check with Burns and Wilcox.  But our standard
18 procedure is that if a broker is to be approved, then
19 at the point of approval, because they have to go
20 through an application process and so on, which we've
21 been through in the earlier deposition, once a broker
22 is approved, they are sent the business manual to
23 assist them, basically.
24     Q.  And so you don't know -- Burns and Wilcox
25 is a large outfit.  You don't know if any particular



BERIC T. USHER
GREAT LAKES INSURANCE vs CRABTREE

October 27, 2021
57–60

Page 57

1  alongside of.  The operation instructions, the very
2  first paragraph, specifically states that they are
3  not authorized to bind a risk.  They are the agent of
4  the insured, and not of insurers.
5      Q.  And is that a different document you're
6  talking about?
7      A.  You've already had those documents.  The
8  operating guidelines.  We secured the one that was
9  actually signed by Barns and Wilcox if you recall.
10     Q.  I'm looking on page 8, and it says, "In
11  light of these restrictions, we'll be unable to issue
12  a binder until such time as we have sufficient
13  information to ensure that the risk as quote
14  represents what the assured requires."  So does that
15  mean that you only provide a binder after getting
16  sufficient information?
17     A.  We provide a binder with subjectivities.
18  We have added -- if we have adequate information, for
19  example, we've got the details, description of the
20  vessel, the address of the insured, the signed
21  application form -- well, the signed application form
22  is for a policy.  Are you looking at binding a
23  policy?  Or issuing a temporary binder?  What section
24  are your looking at?  It's not --
25     Q.  Page 8, "Binding a policy."

Page 58

1      A.  Page 8.  Yes.  It tells you what you need
2  to -- effectively, the broker is obliged to ensure
3  there is accepting our quotation in its entirety.
4  This includes any subjectivities.  All right?
5      Q.  And sir, I --
6      A.  Explained with alternative quotes.  Once
7  a policy --
8      Q.  And I mean that -- I don't mean to cut
9  you off, but are you looking at the same document
10  somewhere else so I can stop sharing the screen?
11  You're not looking at what I have up.  Are you?
12     A.  No.  I'm looking at my own.
13     Q.  Okay.  So I'm just going to stop sharing
14  the screen so that we're -- and that's fine.  I just
15  wasn't sure because I was highlighting things and
16  going through it, and I didn't want to -- if you're
17  looking at something different, I don't think it
18  matters.  And I believe that you indicate here that
19  there is a grace period, even if certain
20  documentation is not provided?
21     A.  Yeah.  We were allowing 7 days to provide
22  this information/documentation.  "If at the end of
23  that time, you are unable to give us this, we'll
24  advise you that the vessel cannot be bound until we
25  receive these items.  If you provide such

Page 59

1  information/documentation within the 7-day grace
2  period, we will honor the original bind request
3  without warranty."
4      Q.  And what does that mean?  Without
5  warranty?
6      A.  Normally speaking, we will put warranty,
7  no/none reported losses as of the date.
8      Q.  And so, after the period is over, there's
9  an additional 7-day grace period.  Is that correct?
10     A.  The 7 days grace period.
11     Q.  And further down on page 9, it says, "You
12  are able to amend the assured's name, their address,
13  vessel name, and description, and even make changes
14  to the details of navigation, so long as it doesn't
15  change the premium."  Correct?
16     A.  Correct.
17     Q.  So on page 9, it says, "You may not
18  confirm coverages bound until receive our written
19  confirmation."  Are you aware that Burns and Wilcox
20  confirmed that this coverage was in full force and
21  effect?
22     A.  No.  We confirmed it to Burns and Wilcox.
23  We are not privy to any information that Burns and
24  Wilcox may or may not have passed on.
25     Q.  Do you know if in this particular case, a

Page 60

1  pro forma policy schedule was delivered?
2      A.  Yes.  At the quote stage and at the
3  temporary binder stage.
4      Q.  And do you know if that was provided to
5  the insureds?
6      A.  No.  We just provided it to the --
7  provided it to the broker.  It's up to the broker to
8  then pass that on to the insured.  Again, it's an
9  electronic document in PDF format with a quote and
10  the policy language attached.  It defies belief that
11  the broker would go to the extra effort of trying to
12  detach something from the, the quote document in
13  order to prevent the policy language being attached
14  since it's in PDF.  So normally, we would expect the
15  broker to simply forward the terms either to their
16  retail broker or to the insured, if they did it
17  directly with the insured.
18     Q.  And for expired temporary binders, you
19  can provide an extension period, or an account
20  handler can provide an extension period to allow for
21  documents or information to be received?
22         MS. GOLDMAN:  Objection.
23         THE WITNESS:  Yes.  Yes.  We can.
24  BY MR. NEBLETT:
25     Q.  And that's up to your sole discretion?



Page 61

1   A. Yes. Normally speaking -- I mean, as you
2 -- as I said, in this instance, if you go back to the
3 survey issue, all right, we're specifically saying
4 that the survey has to have been in existence, then
5 maybe extenuating circumstances, the insured is out
6 of town, and all of the documents are at his house,
7 and he's on a 2-week vacation, or whatever. So we
8 can -- we can agree to extend the period if we choose
9 to, providing everything is then supplied and is
10 accepted.
11   Q. And for this particular case, for the
12 Crabtrees' vessel, you didn't find that there was any
13 change in their risk. The only position you have is
14 that you didn't get all of the documents?
15     MS. GOLDMAN: Objection.
16     THE WITNESS: No. That's not the case.
17 The risk did change because our requirement to write
18 the policy was that the vessel was subject to a
19 satisfactory survey, and that all surveyor's
20 recommendations had been complied with.
21     Subsequent, and as a result of our
22 investigation, we established that the
23 recommendations had not been complied with. Had the
24 insured come to us and said, "This is the survey.
25 I've done a few of the recommendations, but I haven't

Page 62

1 done the following ones," which is what the document
2 specifically asked them to do. And then we would
3 have taken a view as to whether we were willing to go
4 on risk or not without those recommendations having
5 been complied with. We were never given that
6 opportunity.
7 BY MR. NEBLETT:
8   Q. And did anyone contact you or Kathy Smith
9 regarding the extenuating circumstances to provide
10 additional documents for this particular case and
11 vessel?
12   A. I think the only thing that we received -
13 - sorry. Come out a bit. Whoops. Why is that not
14 working? We finally received an email on the 7th of
15 June, after a number of chases. And the extenuating
16 circumstance appears to be --
17   Q. The boat caught on fire and burned up?
18   A. No. The extenuating circumstances, as
19 far as we could determine, was the email on the 7th
20 of June from Matthew Evans, saying, "I just saw this,
21 and we're very short staffed right now."
22   Q. So the extenuating --
23   A. It doesn't tell anything -- yeah. That
24 was the extenuating circumstance as far as they were
25 concerned. I don't know, for example, when Burns and

Page 63

1 Wilcox actually received this information.
2   Q. So, the extenuating circumstances
3 wouldn't be that the vessel set on fire with all of
4 the documents or information in it, and my client
5 flew in to attend the vessel after the loss. It
6 would be that the broker apparently dropped the ball
7 and wasn't responding to emails?
8   A. Well, since -- when he did respond, he
9 did send a couple of the surveys, so that was not
10 presumably destroyed on the -- by the fire. Or if it
11 was destroyed by the fire, he had it prior to the
12 fire.
13   Q. And the insureds, the Crabtrees, had told
14 you that they had, in fact, provided all of those
15 documents to the agents and brokers who apparently
16 didn't provide them to you?
17   A. I don't think I've got anything to that
18 effect. That might be in the claims file. It's not
19 in the underwriting file. But regardless, we were in
20 a situation whereby we were finally provided with the
21 survey, which then told us what the recommendations
22 were, which we then asked our surveyor to investigate
23 to establish whether or not those recommendations
24 had, in fact, been complied with. And his findings
25 were that they had not been.

Page 64

1   Q. And sir, regarding a letter of
2 compliance, is it the broker's duty to ensure that
3 the assured has completed that document?
4   A. Yes. He has to complete the document.
5 Presumably, it's not -- it's not an issue of him
6 establishing that he's actually done all of the
7 recommendations because he'd be in no better position
8 than we are as far as that goes.
9   Q. But sir, is it the broker, the person who
10 receives this document that we're discussing, is it
11 their duty to ensure that the assured has completed
12 it, or that any statements in there are acceptable to
13 you?
14   A. No. They just turn to us to determine
15 whether the statements are acceptable to us.
16   Q. So if your business --
17   A. The broker must make all diligent efforts
18 to try to ensure that they're going to be acceptable
19 to us. But at the end of the day, we are the sole
20 abatures as whether they're acceptable or not.
21   Q. And do you know if in this particular
22 case, the broker, agent, or anyone raised any issues
23 regarding a letter of compliance?
24   A. I don't believe so, because we weren't
25 aware of any issues with the letter of compliance



Page 65

1  until we received the survey.  And we didn't receive
2  the survey until the 7th of June.  Until we received
3  the survey, we had no idea what recommendations were
4  in the survey.
5     Q.  And you're aware that the survey and the
6  letter of compliance were provided to the agents and
7  brokers well before the loss?
8         MS. GOLDMAN:  Objection.
9         THE WITNESS:  No.  We're not aware of
10 that.  We received it on the 7th of June.  That's the
11 first time we received the survey.
12 BY MR. NEBLETT:
13    Q.  And isn't that --
14    A.  We received the letter of compliance --
15 crikey.  jumping around all over the place.  We
16 received the letter of compliance on the 23rd of
17 April with the request to bind coverage.  We went
18 straight back and said that the letter of compliance
19 is valueless without the survey, because how could we
20 tell what the recommendations were to be complied
21 with.  So we went back, straight away, and said,
22 "You've got to send us the survey."
23    Q.  And do you know if any of that
24 information was ever passed along to the Crabtrees?
25    A.  No.

Page 66

1         MS. GOLDMAN:  Objection.
2         THE WITNESS:  Only the broker.
3  BY MR. NEBLETT:
4     Q.  And as an underwriter, you can require
5  that some recommendations be completed sooner rather
6  than others?
7     A.  Yes.
8     Q.  And you can determine, with some
9  discretion, if some recommendations need to be
10 completed at all?
11    A.  Correct.
12    Q.  And is there any document that talks
13 about that discretion regarding compliance?
14    A.  No.
15    Q.  And would you be the person who would
16 determine if there is some discretion as to
17 compliance or timing?
18    A.  Yes.
19    Q.  And is there anyone else that would make
20 that determination, or could make that determination?
21    A.  No.
22    Q.  And is there any document which would go
23 through or list what may be discretionary,
24 immaterial, or otherwise regarding compliance?
25    A.  No.  It's my discretion as to whether I'm

Page 67

1  willing to waive, bearing in mind all the documents
2  to start with comply with all recommendations.  Okay?
3  So in the event that somebody instead of saying,
4  "Yes.  I've complied with all the recommendations,"
5  and we have the survey listing all the
6  recommendations, then it is the, the staff -- my
7  staff will then refer it -- sorry.  If the insured
8  then comes back and says, "I've done some of the
9  recommendations, but I haven't done the following
10 ones," which is what the document specifically
11 requests, "List all the recommendations not yet
12 complied with," then I can review the recommendations
13 that have not yet been complied with and say, "These
14 are the ones you must do immediately.  These ones can
15 wait.  And these ones I'm not interested in."
16    Q.  And was that ever done in this particular
17 case with the Crabtree vessel?
18    A.  No.  Because we didn't receive the list
19 of recommendations until long after the fire.
20    Q.  And sir, I think the last deposition, you
21 agreed that some of the recommendations, for
22 instance, with the cushions should be cleaned or
23 something like that, have nothing to do with
24 anything.  Is that correct?  And it wouldn't be
25 something that you would require.

Page 68

1     A.  That's correct.  That's correct.  And
2  that is the purpose of it.  Because the document
3  requires that all recommendations are complied with,
4  the document invites the insured to say, "These ones
5  have not been complied with."  Okay?  Then I can look
6  at the ones that have not been complied with and
7  determine whether I consider them to be material or
8  not, or bind -- or anything to do with the safety or
9  integrity of the vessel.
10    Q.  And so, is it fair to say that only
11 things that have to do with the safety or integrity
12 of the vessel are material?  Because obviously the
13 cushions aren't a big deal.
14    A.  No.  It's obviously not.  And in the
15 event that it is purely cosmetic, bear in mind this
16 was -- you know, as we subsequently found out when we
17 secured it, was a pre-purchase survey.  As a
18 consequence, surveyors are normally going to find a
19 detail on a pre-purchase survey than they just do on
20 a condition valuation survey.
21        Frequently, as a consequence, they would
22 go into things like, is the cooker working properly?
23 Is the the refrigerator working properly?  Are the
24 lights working properly?  And I'm not talking about
25 navigation lights, the interior, cabin lights.  The



Page 69

1 cushions, are they damaged, faded, torn?  Is the
2 carpet in good condition.  All these issues do not go
3 to the safety of the vessel.
4      But at the end of the day, ultimately,
5 it's in my discretion.  I could turn around and say,
6 "No.  I want that fixed."  For example, there could
7 be a crack in the windscreen.  Depending on what the
8 intended navigation of the vessel, that could be
9 something that goes to the integrity of the vessel.
10 It would depend on how deep the crack was, whether it
11 could blow through, whether it was water-tight, and
12 so on.  All right?  So sometimes, I may well take the
13 view, "No.  I need that sorted out."  Because I'm not
14 going to go and visit the vessel and determine for
15 myself what the condition of the vessel is.  I can
16 only rely on the documents that are presented to me.
17      Once I secured a copy of the survey,
18 there were numerous recommendations:  A
19 recommendations, B recommendations, and C
20 recommendations.  The vast majority of the C
21 recommendations were more cosmetic.  The item --
22      Q.  And so --
23      A.  -- B recommendations were essential.
24      Q.  And so the C recommendations are not
25 material at all?

Page 70

1      MS. GOLDMAN:  Objection.
2      THE WITNESS:  I didn't say that.  But
3 many of the C recommendations were cosmetic.
4 BY MR. NEBLETT:
5      Q.  And are there any C recommendations that
6 you believe are important recommendations?
7      A.  I believe there were some, but it's going
8 to take me a while to find them, presuming you want
9 me to find them.
10      Q.  Just if you had one, I thought we had
11 sort of agreed before they weren't material or
12 important, but if you have one that you think is, I'm
13 curious.
14      MS. GOLDMAN:  Tony, if it assists, I
15 think the C recommendations begin on page 53 of the
16 underwriting file.
17      THE WITNESS:  I think, probably I would
18 look at the smoke detectors, carbon monoxide
19 detectors,
20 BY MR. NEBLETT:
21      Q.  And that would be it for the C
22 recommendations?
23      A.  I'm still looking.  I may have been
24 concerned about the LPG tanks being over 12 years of
25 age.  But I think that's about it.  The rest of them

Page 71

1 are really cosmetic.
2      Q.  And the LPG tanks, didn't the survey say
3 that it was in good working condition and there
4 weren't any problems?
5      A.  Well, the surveyor said that the dates on
6 the tanks are both over 12 years old, replace with
7 new.
8      Q.  And do you know if in this particular
9 case a premium was returned to the Crabtrees?
10      A.  We certainly canceled the policy, so I
11 assume it would have been accounted to Burns and
12 Wilcox.  But I don't know.  I don't know if it was
13 returned by Burns and Wilcox via the agent to the
14 Crabtrees.
15      Q.  And is it your understanding that if a
16 policy is canceled, then the full amount of the
17 premium should be returned to the assured?
18      A.  Yes.  Well, the amount -- because the
19 broker, if the -- if you're canceling the risk
20 abnegation, the broker is not entitled to its
21 brokerage.  So, we would refund exactly the amount we
22 received.  They should, therefore, refund exactly the
23 amount they received.  And if there is another broker
24 in the chain, they should refund exactly the amount
25 they received, ultimately with the assured receiving

Page 72

1 the full amount that he paid.
2      Q.  And is there anything in the business
3 manual or other documents that detail that?
4      A.  No.  It does mention flat cancellations.
5      Q.  And if the assureds were not provided
6 with a refund of their premiums, then who's on the
7 hook for that?
8      MS. GOLDMAN:  Objection.
9      THE WITNESS:  Whoever didn't give it to
10 the assured.
11      MR. NEBLETT:  And would you be surprised
12 to learn that the assureds were not provided a
13 refund?
14      MS. GOLDMAN:  Objection.
15      THE WITNESS:  I would very -- I would be
16 surprised.
17      MR. NEBLETT:  And that would be wrong,
18 according to your policies and procedures?
19      MS. GOLDMAN:  Objection.
20      THE WITNESS:  Yes.  The broker, if we
21 have refunded the premium, which I believe we did.
22 One moment, please, while I look at the underwriting
23 file.  I think there's something in there about that.
24 It looks like it was processed by our accounting
25 financial director on the 7th of August, 2019.



Page 81

1  Ian Allen, on the 3rd of June, 2019, doesn't say that
2  this is a covered loss. It, it asks us what we want
3  to do.
4       Now going to your other question, when
5  was the decision to deny? It was on the 18th of
6  July, 2019.
7  BY MR. NEBLETT:
8    Q. And how many days would that have been
9  after the binder was issued?
10   A. The binder was issued on the 24th of
11 April, 2019. The loss occurred on May the 7th, 2019.
12 I believe we were advised of it on the 8th.
13   Q. And that's well outside of the binder
14 temporary period?
15   A. Yes. The binder expired on the 24th of
16 May, 2019. So it --
17   Q. And madam -- I'm sorry.
18   A. Go ahead. No. Sorry.
19   Q. And Madam Court Reporter, I believe --
20   A. Yes. The 24th of May. Yes.
21      MR. NEBLETT: Madam Court Reporter, I
22 believe you got a copy of an email chain. Defendant
23 would like to go ahead and mark as, I believe,
24 Defendant's 7.
25      THE REPORTER: I do have that. I will

Page 82

1  mark now.
2       (Defendant's Exhibit 7 was marked for
3  identification.)
4  BY MR. NEBLETT:
5    Q. Okay. Sir, I'm in possession of the
6  email that you sent over regarding the return of
7  premiums. Can you tell me who Alex Thomas is?
8    A. He's an administrative assistant within
9  my office.
10   Q. What about Mark Thomas?
11   A. He's my claims director.
12   Q. And Samantha Thomas, I believe we've
13 already spoken about. What about Ali Kahn and Mike
14 Calvert?
15   A. Mike Calvert is our financial director.
16 Ali Kahn was an accounts assistant.
17   Q. And do you have any documentation showing
18 that, I guess, a return of premium was actually made
19 to the broker?
20   A. I wouldn't have access to that
21 information on my computer here because it's an
22 accounting entry. It would be -- Mike Calvert might
23 still have the archived statements.
24   Q. It seems to me, from looking at this,
25 that there was a wire?

Page 83

1    A. Yes. Hang on.
2    Q. And I may be reading this incorrectly,
3  but it was a wire then sent to the broker with the
4  premiums?
5    A. Okay. This is -- the initial email is
6  from Burns and Wilcox to Ali in our accounts
7  department, "Please see attached for wire transfer
8  backup." All right. And then Ali, in our account
9  department, has gone back and said, "Unfortunately,
10 we must send these funds back, as we are unable to
11 accept this payment. This is due to the payment
12 including a policy, Bryan Crabtree, we are unable to
13 accept payment for." So, it wasn't refunding the
14 premium. We never accepted the premium in the first
15 place. So the end goes on to say, "Can you re-send
16 the funds without the Bryan Crabtree premium, and we
17 can allocate the remaining payment. If unable to do
18 so, can you send your wire ID so we can re-send your
19 payment once it appears in the bank?"
20   Q. So I think I understand why I was
21 confused when I looked at this. So it appears that
22 Burns and Wilcox never paid the premium, even though
23 my client paid it to them three months earlier?
24      MS. GOLDMAN: Objection.
25      THE WITNESS: Well, they tried to pay it,

Page 84

1  and we didn't -- we refused to accept it because by
2  the time the payment was coming through, we had
3  already elected that we were canceling the policy
4  flat.
5  BY MR. NEBLETT:
6    Q. So the first time that Burns and Wilcox
7  sends any money to you from an April 24th binder is
8  July 24th?
9    A. Yeah. It would appear so. Slow, aren't
10 they?
11   Q. I mean, isn't that improper?
12   A. We allow -- normally allow -- this is
13 outside the terms of credit. But because we transact
14 a lot of business with various brokers, it's not just
15 individual policies. We don't take payments on an
16 individual policy basis. We do an accounting
17 statement. This, because it was an April attachment,
18 would have appeared in our April statement, which
19 would have been issued on or around the 15th of May.
20 They, then technically have 45 days to pay us. So it
21 should have been paid to us by the end of June. But
22 clearly, it's not actually being paid until the 25th
23 of July. Poor credit control, I say.
24   Q. And that was after you had already denied
25 coverage?



Page 85

1  A.  Yes.
2  Q.  And so, within this wire, there would
3  have been payment for other premiums, not including
4  the Crabtree premium?
5  A.  That's correct. It would have been the
6  payment of an entire statement of all the premiums
7  that were processed during the month of April, and/or
8  returns of premium, and so on. Anything that was
9  outstanding at that time.
10 Q.  I mean, from your review of this file,
11 does it just appear that Burns and Wilcox was
12 dropping the ball all over the place?
13    MS. GOLDMAN:  Objection.
14    THE WITNESS:  No. I don't think they
15 were dropping the ball all over the place.
16 Certainly, they appeared to have dropped the ball on
17 this one. I'd have to ask my financial director what
18 their payment record was. But if it was something
19 that gave rise -- or cause for concern as far as he
20 was concerned, then I would imagine he would report
21 it to me. Because obviously, if a broker is not
22 paying us on a regular basis, we don't want to do
23 business with them.
24 BY MR. NEBLETT:
25 Q.  And we understand that -- I guess there's

Page 86

1  no dispute that you were sending, and when I say you,
2  CSR, was sending documents and requests for documents
3  to Burns and Wilcox, but they simply weren't
4  responding.
5  A.  That's certainly true from the
6  underwriting file because particularly, once we were
7  aware of the incident, all right, we had already sent
8  a document headed in bold red, "Urgent," on the 17th
9  of May, saying, "We still haven't gotten these
10 documents." And then we chased it again on the 4th
11 of June, telling them that the binder has expired in
12 the same urgent advice. Still no response. And we
13 sent it again with a chaser, saying, "Please urgently
14 respond." And then on the 4th of June, we sent it to
15 a generic boat quote at Burns and Wilcox, "In Matt's
16 absence, please review and respond." And then,
17 finally -- and then we sent another one -- hang on.
18 What's this? I can't open it. Hold on. Let me open
19 it. Possibly is already open.
20 Q.  That would be the June 7th you're looking
21 at --
22 A.  Yes.
23 Q.  -- where he says, "I'm so sorry"?
24 A.  Yes. And then we responded to that on
25 the 7th of June, highlighting issues we had with

Page 87

1  those documents.
2  Q.  And so, I think it's fair to say that
3  when Burns and Wilcox respond, saying, "I'm so sorry,
4  we're short staffed. I have all the information,"
5  and they sent things to you after multiple requests
6  to them but no response, that they're not doing what
7  they should be doing?
8  A.  That is fair to say, particularly as far
9  as this file is concerned.
10 Q.  And I noted in an email, I guess the June
11 4th email, where there was something that says, "In
12 Matt's absence, please review and respond." Do we
13 know what Matt's absence was? Or what was going on
14 there?
15 A.  No.
16 Q.  And then a few days later, he responds
17 that he is so sorry. But we don't know if he was
18 actually absent or just short staffed?
19 A.  Well, the only thing -- because Katherine
20 Smith has mentioned, she sent a chaser again on, I
21 say at, 13:53 on the 4th of June, early in the
22 morning. What she may have received, and it didn't
23 go in the file for some reason, is an out of office.
24 If she got an out of office response, then she's now
25 gone to a generic because she has no one else to

Page 88

1  contact, and said -- because she's saying, "In Matt's
2  absence." She may have even called them and said,
3  "We need to get these answers."
4  Q.  And due to the fact that Burns and Wilcox
5  was not responding, or not timely responding, why
6  didn't CSR contact the assured directly?
7  A.  All our correspondence goes through the
8  broker. I'm not even sure if we even had Mr.
9  Crabtree's contact details. All we have is his
10 address. But only is going to speed anything up by
11 writing to him.
12 Q.  And I note that there is an email from
13 June 7th from Ms. Smith to Mark, I think, in response
14 to the "I am so sorry" email.
15 A.  Yes.
16 Q.  And I note that it continues to say that
17 there is still personal policy limit at $40,000.
18 A.  No. It says, "The application form still
19 shows a personal property limit of 40,000." 25,000
20 was quoted and bound at the quote and binder, noted
21 that the limit offered was the maximum available. So
22 we're saying, "It's 25,000. At this point -- sorry.
23 At this point, this would simply be pointed out to
24 the broker." What we're saying is that the
25 application form is still requesting 40,000. But

