UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 20-81544-CIV-RKA


GREAT LAKES INSURANCE SE,    . Miami, Florida
                             . July 13, 2022
            Plaintiff,       . 1:03 p.m.
                             .
            v.               .
                             .
BRYAN CRABTREE, ET AL.,      .
                             .
            Defendants.      .
. . . . . . . . . . . . . . . .


- - - - -

Transcript of Zoom Motion Hearing had

before the Honorable Roy K. Altman,

United States District Judge.

- - - - -


Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

APPEARANCES:

```
For the Plaintiff:      Jacqueline L. Goldman, Esq.
                        Goldman and Hellman, P.A.
                        8751 West Broward Boulevard
                        Suite 4040
                        Ft. Lauderdale, Florida  33324

For the Defendant:      David A. Neblett, Esq.
                        Perry & Neblett, P.A.
                        2550 S. Bayshore Drive
                        Suite 11
                        Miami, Florida  33133

ALSO PRESENT:           Bethea Mackenzie Crabtree

Court Reporter:         Francine C. Salopek, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        299 E. Broward Blvd., Room 207
                        Fort Lauderdale, Florida 33301
                        (305)301-3276
```

- - - - -

```
 1              WEDNESDAY, JULY 13, 2022, 1:03 P.M.

 2              (The Judge entered the Zoom)

 3              (Discussion had off the record)

 4         THE COURT:  Go ahead and call the case, Fran.

 5         THE COURT REPORTER:  Judge, we're here for the case of

 6  Great Lakes Insurance SE vs. Crabtree, et al., Case Number

 7  20-CV-81544.

 8         THE COURT:  All right.  Good afternoon.

 9         Who's here for the plaintiff?

10         MS. GOLDMAN:  Good afternoon, Your Honor, Jacqueline

11  Goldman for Great Lakes.

12         THE COURT:  Good afternoon.  And who's here for the

13  defense?

14         MS. HARWOOD:  Good afternoon, Your Honor.  David

15  Neblett on behalf of the defendants.

16         THE COURT:  Good afternoon to you.

17         All right.  We're here on the cross-motions to strike

18  experts.  Any additional thoughts that weren't in the briefing

19  before I give you my ruling?

20         Ms. Goldman?

21         MS. GOLDMAN:  No, Your Honor.  It was all in the

22  briefs.

23         THE COURT:  Mr. Neblett?

24         MR. NEBLETT:  Your Honor, the only thing I wanted to

25  direct you to was a supplemental filing that was 175, which was
```

1  a very recent opinion from, I believe, July 6th, relating to

2  this particular expert that plaintiffs have.  It's obviously

3  not in this case, but we believe it may be instructive and just

4  wanted to alert you to that's why we filed that case.

5             THE COURT:  Yep.  I appreciate that.

6             Okay.  Thank you very much.

7             All right.  The Crabtrees sought a marine insurance

8  policy for their vessel from Great Lakes.  That's from the

9  Statement of Stipulated Facts, ECF Number 34, paragraphs one to

10 two.

11            Great Lakes issued them a policy -- the terms of which

12 the parties dispute.  After the Crabtrees' vessel was damaged

13 in a fire, the Crabtrees filed a notice of loss asking Great

14 Lakes to pay $250,000 insured value of the vessel.  That's from

15 the Complaint at 4, and the defendants' Second Amended Answer,

16 as well as the Statement of Facts at 4.

17            Rather than pay, Great Lakes sued the Crabtrees in

18 admiralty seeking declaratory relief, arguing that it had no

19 duty to pay because the Crabtrees:  One, failed to satisfy the

20 coverage requirements; and, two, made material

21 misrepresentations in their insurance applications.  That's the

22 Complaint at 3 to 5 and 5 to 7 and 9.  I previously granted

23 Great Lakes' Motion for a Bench Trial.  See Order Granting the

24 Motion for a Bench Trial, ECF Number 136.

25            The defendants have filed a Motion to Strike the.

1   Plaintiff's expert.  That's the Crabtrees' motion.  That's ECF

2   Number 119.  And the plaintiff has filed the Motion to Strike

3   the Defendants' Expert.  That's the plaintiff's motion, ECF

4   Number 116.  Those motions are now ripe for resolution.

5          I'll take the plaintiff insurer Great Lakes's motion

6   first.  Great Lakes Insurance moves to strike F. David

7   Famulari, the Crabtrees' expert, "under both *Daubert* and

8   Federal Rule of Civil Procedure 26," because "his expert

9   witness disclosure and report are insufficient, do not provide

10  any methodology, lack any relevant opinions, and would not

11  assist the trier of fact."  That's from the motion at 1.

12         According to Great Lakes, "Mr. Famulari's expert

13  report is nothing more than a recitation of the claim upon

14  which the defendants wish to prevail with few actual opinions

15  stated; where he does actually state an opinion is an

16  impermissible legal conclusion, without basis in scientific,

17  technical, or specialized expertise," and "at no point does

18  Mr. Famulari state how he arrived at his opinions."  Again,

19  that's from the Motion at paragraph -- excuse me -- at page 3.

20         Here's a summary of Mr. Famulari's report.

21         According to the Crabtrees, they proffer Mr. Famulari

22  to:  "Generally opine that the subject loss of their vessel was

23  a fortuitous event and that the loss was unrelated to any

24  survey requirements or recommendations that may or may not have

25  been complied with.  The underwriter has sufficient information

1    to issue an agreed value insurance policy, as evidenced by the

2    binder in full force and effect at the time of the loss."

3            "Further, he will opine that the Crabtrees did not

4    make any material misrepresentations on the application for

5    insurance or during the claims process and that the Crabtrees

6    completed, or were in the process of completing, all material

7    recommendations outlined in the report and survey of the

8    Crabtrees' vessel."  That's from their Initial Expert

9    Disclosure, ECF Number 116-1 at 1 to 2.

10           According to his expert disclosure and report,

11   Mr. Famulari was retained by the Crabtrees "to testify as to

12   all aspects of the marine insurance industry; with an emphasis

13   on underwriting; underwriting standards and policies (or lack

14   thereof); marine insurance claims; compliance; materiality;

15   marine survey' surveying; survey requirements; marine policies;

16   compliance; 'binders' of insurance; broker and agency

17   relationships; agency generally; insurance applications; costs;

18   seaworthiness; cause of the loss; salvage; towing; yard and

19   storage bills; mitigation; adjusting; vessel repairs and

20   repairs costs; cost of replacement of vessel; fair market

21   values of vessel; fair market value of vessel parts and labor;

22   marine insurance companies; insurance companies; requirements

23   of adjustors; agency; requirements of surveyors; post-loss

24   requirements; coverage; bad faith; claims handling; and the

25   policy and application at issue.  That's from the expert

1   disclosure and report of Mr. Famulari, ECF 116-2, at 1.

2          Famulari claims to have "extensive hands-on and

3   industry experience."  That's from his disclosure at 1.

4          He's "board certified in admiralty and maritime law

5   and has been a member of the Florida Bar since 1990."  That's

6   at page 3.

7          Before attending law school, he was "a commercial

8   fishing boat captain" and "over 13 years, he spent an average

9   of 200 days a year at sea and managed two offshore lobster

10  boats."  Also at page 3.

11         He also worked "with the newly formed National Marine

12  Fisheries Service in developing fisheries management policies,"

13  and he "consulted with marine insurance companies and the

14  U.S. Coast Guard on fishing vessel safety issues.  And he

15  helped to create a framework for what eventually became the

16  Fishing Vessel Safety Act of 1988."  That's his disclosure at

17  page 4.

18         Since graduating from law school in 1990, he has

19  "worked with a major marine insurance broker in New England in

20  assessing risks, and the placement of insurance on commercial

21  vessels" and he's "been a maritime law practitioner ever

22  since."  Also at 4.

23         His legal practice "currently consists primarily of

24  maritime insurance defense, including Jones Act claims,

25  collisions, salvage, passenger claims, limitation of liability,

1  longshore claims, 905(b) claims, marina liability claims,

2  engine damage claims, cargo claims, and dock damage claims" and

3  he "also provides coverage opinions to prominent United States

4  marine insurers."  Also at page 4.

5         The disclosure specifies that, in forming his

6  opinions, he considered "a review of the policy of insurance,

7  including the 'binder'; underwriting guidelines, or lack

8  thereof; the Stetler report and survey; and surveys and reports

9  authored by all parties."  That's the Disclosure at 2.

10         He also reviewed post-incident investigation documents

11  and photographs, various publications, discovery documents, and

12  Florida statutes and laws.  That's page 3.

13         Mr. Famulari's gives us several opinions:  One, "that

14  the Crabtrees completed, or were in the process of completing,

15  all material recommendations outlined in the report and survey

16  of the Crabtrees' vessel"; two, "the subject loss was a

17  fortuitous event, and that the loss was unrelated to any survey

18  requirements or recommendations, that may or may not have been

19  complied with"; and, three, "that the Crabtrees did not make

20  any material misrepresentation on the application for insurance

21  or during the claims process."  That's at page 2 of his

22  disclosure.

23         Let's talk about Rule 26(a)(2)(B) for a second.

24  Witnesses who must provide a written report.  Unless otherwise

25  stipulated or ordered by the Court, this disclosure must be

```
 1   accompanied by a written report -- prepared and signed by the

 2   witness -- if the witness is one retained or specially employed

 3   to provide expert testimony in the case or one whose duties as

 4   the party's employee regularly involve giving expert testimony.

 5        The report must contain:  "One, a complete statement

 6   of all opinions the witness will express and the basis and

 7   reasons for them; two, the facts or data considered by the

 8   witness in forming them; three, any exhibits that will be used

 9   to summarize or support them; four, the witness's

10   qualifications, including a list of all publications authored

11   in the previous ten years; five, a list of all other cases in

12   which, during the previous four years, the witness testified as

13   an expert at trial or by deposition; and, six, a statement of

14   the compensation to be paid for the study and testimony in the

15   case."

16        Great Lakes contends that Famulari's disclosure

17   doesn't meet these requirements because "not only does

18   Mr. Famulari's report not state any relevant opinions, he does

19   not state how he arrived at those opinions, beyond a general

20   statement that he has years of experience as an admiralty

21   attorney."  That's their Motion at 5.

22        It also argues that Famulari doesn't "state the one

23   issue which is relevant to this case:  Whether the Crabtrees

24   actually complied with the Stetler survey recommendations, as

25   represented in the Letter of Compliance that they submitted."
```

1  Also from page 5.

2        According to Great Lakes, Mr. Famulari "admits that

3  some recommendations 'may or may not have been complied with,'

4  but he fails to identify which ones."  Also that's from page 5.

5        In response, the Crabtrees lay out the specific types

6  of information Rule 26(a)(2)(B) requires -- that's page five of

7  their response -- and they argue that Great Lakes's argument

8  for the record doesn't state any relevant opinion is flatly

9  incorrect."  That's from page 5 of their response.

10        According to the Crabtrees, Famulari's "most important

11  opinions are clearly contained within his report."  That's from

12  page 5.

13        The response also notes that Famulari's expert report

14  includes "an extremely detailed list of facts, data, and

15  information" that Famulari considered in forming his opinions.

16  That's from page 6.

17        In its reply, Great Lakes contends that "of the four

18  statements which could be charitably referred to as 'opinions,'

19  the only relevant issue which Mr. Famulari's opinion touches

20  upon is whether the defendants had completed the Stetler Survey

21  recommendations.  That's from pages 2 and 3 of their reply.

22        And "on this issue," they say, "he states only his

23  'preliminary opinion' that some items were complete without

24  identifying which those were, and thus is really no opinion at

25  all."  Also from page 3.

1           Although I generally take an expansive view of what

2    expert evidence should be permitted at trial, I agree that

3    Mr. Famulari's report fails to comply with the requirements of

4    Rule 26.  Rule 26(a)(2)(B)(i) requires the report to include "a

5    complete statement of all opinions the witness will express and

6    the basis and reasons for them."

7           Here, a careful review of Mr. Famulari's report shows

8    that the only statements that really could be construed as

9    opinions are these:  One, "I will opine as to Great Lakes' and

10   its representatives' business practices, agency, the agents/

11   brokers Great Lakes requires to operate in the United States;

12   and statements/waiver made and effectuated by Great Lakes's

13   hired adjustors/agents."

14          Let me ask you about this, because I'm going to give

15   you a chance to amend, Mr. Neblett.  Okay?  So I'm going to

16   explain to you exactly why I think your record is deficient and

17   why it's so deficient that I can't really get to the *Daubert*

18   inquiry, because I don't know what data and methodology he used

19   to arrive at these opinions.

20          But on this first opinion, I'm not sure why it's

21   relevant at all.  Can you explain that to me?  The one about

22   the general practices of this insurance company and the

23   industry as a whole, and who they place insurance with, and

24   which brokers they work with around the country?  How is that

25   relevant to this case at all?

1          MR. NEBLETT:  Yes, Your Honor.

2          So one of the main issues in this case is who the

3    broker is and whose agent that might be.  So I believe that

4    plaintiff does not contest that documents were delivered to the

5    broker Burns & Wilcox.  There's just a dispute as to whose

6    broker they were.

7          So, there is a broker in the middle.  They got a bunch

8    of documents that they get to Great Lakes and did they get from

9    my client *(sic)*.  And if this broker has it, whose broker is

10   it?  So, that's one, I think, one of the main contentions in

11   the case.

12         THE COURT:  So, what your expert wants to say is that

13   broker is the agent of Great Lakes, not of the Crabtrees?

14         MR. NEBLETT:  Correct.

15         THE COURT:  Okay.  And on what basis is he going to

16   say that?

17         MR. NEBLETT:  He's going to say that basically by

18   reviewing the pattern and practice of insurers.  He's worked

19   with a number of reinsurers on the defense side and actually

20   worked within an insurance company, so he can say this is how

21   insurers do it, this is how it works, this is how brokers will

22   do it.

23         And we're dealing with surplus lines, as I'm sure Your

24   Honor is aware, and they have specific brokers.  And there's

25   actually brokerage agreements in this case where Great Lakes or

1    kind*s* of special risk elects Burns & Wilcox as the broker.

2             THE COURT:  Okay.  Well, as you see, as we're about to

3    get to this point, he doesn't explain any of that in his

4    report, right?

5             MR. NEBLETT:  I mean, I think it's -- I would -- it's

6    not very precise, but there's a lot of information there.  It's

7    industry practice and all this stuff.  I could try --

8             THE COURT:  Maybe you can try to say -- Rule 26 is

9    clear, you can't just say, "I'm an expert, I know the industry

10   practice, and therefore my opinion is this guy was Great

11   Lakes's expert, not the Crabtrees'."  That's not sufficient.

12   You've got lay out the specific pieces of your experience that

13   you're relying on, and the methodology that you're using to

14   formulate that opinion.  Does that make sense?

15            MR. NEBLETT:  Yes, Your Honor.

16            THE COURT:  Okay.  All right.  So that's the first

17   opinion that he posits.

18            The second opinion: "My preliminary opinions are that

19   the Crabtrees completed or were in the process of completing

20   all material recommendations outlined in the report and survey

21   of the Crabtrees' vessel."

22            The third opinion is, "I opine that the subject loss

23   was a fortuitous event, and that the loss was unrelated to any

24   survey requirements or recommendations, that may or may not

25   have been complied with."  Let me ask you, why is that

1    relevant, Mr. Neblett?

2         MR. NEBLETT:  Well, I believe, Your Honor, that the

3    plaintiffs have now stipulated that they are not disputing the

4    fortuity of the loss.

5         THE COURT:  Okay.  Is that true, Ms. Goldman?

6         MS. GOLDMAN:  Yes, Your Honor, that's not one of the

7    bases for denial of the claim.

8         THE COURT:  All right.  So, we now don't need that

9    opinion, is that what you're saying, Mr. Neblett?

10        MR. NEBLETT:  And I believe in their reply they

11   stipulated they're not disputing it, so I guess we don't need

12   anyone to provide any testimony on --

13        THE COURT:  That one easy.

14        Okay.  Number four, "the underwriter had sufficient

15   information to issue an agreed-value insurance policy worth

16   250K as evidenced by the binder in full force and effect at the

17   time of the loss."

18        Why is that relevant, whether it had information or

19   not?  The question's whether the information it had was true or

20   not, isn't it?

21        MR. NEBLETT:  Not necessarily, Your Honor.  And I

22   think they sort of stipulate to some of this as well in their

23   reply.  But the issue is whether or not there was a policy of

24   insurance in place.  And part of that has to do with what

25   information they had.  And if they knew that, enough to provide

1   a binder for a certain amount of money, then there was a

2   policy.

3          And so that's I think, part of their positions is that

4   they didn't have enough information, they couldn't issue the

5   policy.  Well, the information would be they knew how much the

6   boat was, they put the price on the boat for the agreed value

7   and sent the policy out.

8          THE COURT:  Okay.  Ms. Goldman, let me hear from you

9   about that.

10         MS. GOLDMAN:  Your Honor, this is another issue where

11  I think defendants are somewhat confused as to what Great Lakes

12  is contending.  Great Lakes admits that there was a temporary

13  binder in place at the time of the loss, but that the temporary

14  binder had certain conditions which were not met, which means

15  that the temporary binder became void from inception.

16         THE COURT:  That's my understanding of the claim, as

17  well, Mr. Neblett.  Throughout the whole pendency of the case I

18  thought that's what was at issue.  So, the sufficiency of the

19  evidence or information that was provided to Great Lakes isn't

20  so much at issue.  What's at issue is:  A, did the temporary

21  binder, did it have these caveats; B, did those get fulfilled;

22  and, C, in any event, were there misrepresentations made in the

23  process?  That's really the case.  Don't you think,

24  Mr. Neblett?

25         MR. NEBLETT:  Generally, Your Honor.  But I think that

1  what our expert is opining is that what they had was the actual

2  policy.  They had all the information, they had everything, and

3  so that was the policy.

4           THE COURT:  That's not the question.  The question is,

5  there is a policy.  She's agreeing to that.  She's saying it's

6  a policy with certain preconditions.  And whether they had

7  certain pre-- enough information is irrelevant to whether there

8  were preconditions in the policy.  Does that make sense?

9           MR. NEBLETT:  I think that's not their position,

10  though, Your Honor.  I think they're not saying there was

11  that --

12           THE COURT:  She just said that's their position.

13           MR. NEBLETT:  -- compliance -- I'm sorry, I couldn't

14  hear you.

15           THE COURT:  She just said that's their position.

16           MR. NEBLETT:  Well, I think there may be a fine

17  difference between a binder and a policy.  And I think that's

18  the issues that we're saying that it's one, and then it might

19  be post-loss compliance something else.  They're saying there

20  has to be a temporary binder, then a policy, then post-loss

21  conditions.  So I think we're saying these two steps are

22  together.

23           THE COURT:  But the question -- whether that's true or

24  not, the question is why they're contending that.  I'm not here

25  to decide the merits of the case.  I'm just saying that their

```
 1   position isn't, as I hear her and as I read the documents,

 2   their position isn't that the reason there wasn't a full policy

 3   is because they didn't have enough information, which is what

 4   this opinion is saying.  Yes, they did.  The reason is because

 5   she's saying that in order to get a full policy, the binder

 6   gave you certain preconditions that weren't met.

 7            Now, whether that's true or not is beyond the ken of

 8   this hearing.  But the point is that whether the insurance

 9   company had enough information in its hands, which is what this

10   opinion is saying, is neither here nor there to that issue.

11            MR. NEBLETT:  Your Honor, but what they're going to

12   say is that they needed the other information, for instance, to

13   determine the value of the boat.  Because if they have enough

14   information to determine the value of the boat, they don't need

15   this other stuff.  So --

16            THE COURT:  If they wanted more information, they can

17   always ask for more information as a condition of the contract.

18            In other words, just because he thinks that he would

19   have been okay with saying "I would have gone and issued a

20   policy based on this information without asking for more

21   information," doesn't mean that Great Lakes wasn't entitled to

22   ask for more information in its contract or binder, whatever

23   it's called.  And if they did -- if they didn't, then that's

24   irrelevant.  But if they did, then that's what they required,

25   right?
```

1          MR. NEBLETT:  This would go to materiality.  So, if

2     you read the cases, one of the things they say is the material

3     issue is the value of the boat.  So, if the insurance company

4     can't determine the value of the boat, they can ask for

5     additional information.  That would be a material term.

6          But some of this other stuff is not material in any

7     way.

8          THE COURT:  That's a separate -- he has a separate

9     opinion about materiality.

10          MR. NEBLETT:  But one of the elements -- and the case

11     law usually discusses the value.  That's one of the main things

12     that they would argue.  So, if they are now stipulating to

13     this, but there are other things that go along with that in

14     terms of materiality *(cross-talking)* in the case law.

15          THE COURT:  Okay.  I still don't understand why this

16     opinion is relevant to what they're actually claiming.

17          MR. NEBLETT:  Because the opinion is that once they

18     issued the temporary binder, that was actually the policy, that

19     you don't need the second step.

20          THE COURT:  You can't say that, only I can read the

21     policy and say that.  That's a matter of contract

22     interpretation.

23          MR. NEBLETT:  But they're going to put their corporate

24     rep. on the stand who's going to say that these things were

25     material and that they would have changed the policy if they

1   had blank and blank, for instance, the value of the vessel

2   might have changed.  So that we need an expert to combat that

3   testimony that we perceive is going to come up as to these

4   issues that they say are material.

5        THE COURT:  So, you just want him to come in and say

6   these extra things were required, but they weren't material.

7        MR. NEBLETT:  Correct, they're not material.

8        THE COURT:  That's what he's going to say in this

9   opinion.

10        MR. NEBLETT:  I'm not sure exactly which opinion

11   you're talking about, but, yes, that's his --

12        THE COURT:  This is Opinion Number 3, the one that I

13   just read, that they had enough information to issue the policy

14   at that time.

15        MS. HARWOOD:  Correct.  Yes, Your Honor.

16        THE COURT:  How does that show that it's not material,

17   though?  Again, whether it was enough information to make him

18   comfortable is kind of irrelevant as to whether it was enough

19   information to make them comfortable, isn't it?

20        MR. NEBLETT:  Well, so, Your Honor, we believe that

21   their corporate rep. is going to say these items are material,

22   and the hallmark point --

23        THE COURT:  Of course he is, because he works for the

24   company.  So, he can say, I would not have engaged in this

25   transaction but for the fact that they complied with A, B,

1    and C.

2         But your guy, who doesn't work for the company, can't

3    get into the brain of the company and say that's not true, that

4    they would have issued the policy even if A, B, and C hadn't

5    been met and the fact that they included them in the policy or

6    binder, whatever, is just surplusage.

7         MR. NEBLETT:  But our expert, Mr. Famulari, has worked

8    with insurance companies specifically to develop policies to

9    work in compliance coverage opinions on the defense side for I

10   believe it's like 35 years.  So, he knows that that's what he

11   does.  He works with insurance companies to determine what's

12   material compliance with applications, compliance with

13   policies.  That's what he does, he's a board certified

14   admiralty attorney who does defense and works with insurance

15   companies.

16        THE COURT:  All right.  The last opinion is to "I

17   opine that the Crabtrees did not make any material

18   misrepresentations on the application for insurance or during

19   the claims process."  How does he know that?

20        MR. NEBLETT:  That would again go back to the issues

21   of materiality.  And it would be the same thing where the

22   corporate rep. says, listen, the value of the boat, we would

23   have only insured it for 200,000, not 250.  Mr. Famulari can

24   say I looked at all of the documents and you had enough

25   information to come to that determination to put an agreed

1    value of 250.  So that's not a material issue that you can use

2    to say that the binder does not become a policy.

3           THE COURT:  So, this is what I was saying.  Those two,

4    those last two are actually just one opinion.  You have enough

5    information, therefore, not material.

6           MR. NEBLETT:  Generally, yes.

7           But I think there's what I would call pre- and

8    post-loss issues.  So -- and one is, does the binder become the

9    policy?  And then if the binder's policy or not, you have

10   post-loss compliance.  So, there would be two separate things.

11          THE COURT:  Okay.  But isn't the post-loss compliance

12   directly related to the materiality question?

13          MR. NEBLETT:  We would say that it depends if there's

14   a binder and a policy, if it's one document, and then there's

15   post-loss or what they're saying is, there's a binder, then you

16   need this to get to the policy and then post-loss after.  So,

17   it's either two steps or three.

18          THE COURT:  Well, what's the difference for this

19   materiality question?

20          MR. NEBLETT:  Because their position is it doesn't

21   even get to be the policy.  You don't even need to get to the

22   third step.

23          THE COURT:  No, no, I understand their position.  But

24   my point is, that all of that is tied into the question of

25   whether there was enough information in order to make a

1    decision before all of these steps were effectuated, right?

2              MR. NEBLETT:  Correct.  But then they also are

3    alleging the post-loss compliance.  They are saying after the

4    loss and if there was a policy or not, he didn't do certain

5    things.

6              THE COURT:  Okay.  Then I'm confused about the first

7    point.  I don't understand then the materiality point at the

8    beginning that you're making a distinction about.

9              MR. NEBLETT:  Because he -- you have -- so you have a

10   binder.  And Mr. Famulari says that binder's actually the

11   policy, you don't need to get to step number 2.  That's a

12   disagreement that we have with plaintiffs.

13             THE COURT:  Okay.  But how is the question of how much

14   information they had relevant to that?

15             MR. NEBLETT:  Because, of, again, the hallmark cases

16   all deal with value.  So, that if the insured comes, the

17   corporate rep. says We would have only insured this boat for

18   200,000.  That would have been a material issue where the

19   binder would not have become a policy.

20             And so Mr. Famulari is saying you had that information

21   for that binder to become the policy.  Then after --

22             THE COURT:  They're not saying that.  They're not

23   saying that.  They're saying that they would have given you the

24   policy if you gave them A, B, and C.  That's what they're

25   saying.

1          MR. NEBLETT:  Well, this is a little bit of a confused

2     case, though, because the client purchased the boat, a week

3     later there's a fire, so this is all during the same time

4     period, during the same 30 days.

5          THE COURT:  I get it.  But there was a deadline to

6     comply with the requirements and they say you didn't comply.

7          MR. NEBLETT:  Well, then there are other issues too

8     because the boat's set on fire and was a total loss.

9          THE COURT:  Don't get to the other issues.  Just

10    explain to me why having enough information *ex ante* is relevant

11    to the question of materiality in a way that's separate from

12    the materiality of the steps that were taken to comply with the

13    caveats the binder had imposed, allegedly imposed.

14         MR. NEBLETT:  I just think there's two separate

15    elements or two things that people are going to look at either

16    for the formation of the policy and then for what I would

17    consider to be post-loss compliance.

18         I think it's basically the same opinion, but they may

19    be in two separate steps.  And if you look at the policy, one

20    is:  Did you do this as is required by the policy?  But if

21    there's no policy, you don't have to do that.  So, again, it's

22    which steps do you have to take.  Because if there's no policy,

23    you don't have to do anything after the loss to comply with the

24    policy.

25         THE COURT:  Well, there is if they tell you that there

1    are requirements, right?

2           MR. NEBLETT:  Well, this is one of the issues we

3    brought up, Your Honor.  In one sentence, they're saying

4    there's no policy.  And then in the other sentence, they're

5    saying, well, you have to comply with the policy.  So, that --

6    it creates some issues in this case, but that's literally their

7    position:  There was no policy, but then you didn't comply with

8    the terms of the policy.

9           MS. GOLDMAN:  Your Honor, he's trying to make

10   something much more complicated than it is.

11          THE COURT:  I agree with that.

12          But let me just -- on this issue, though -- you know

13   what?  It doesn't matter.  This, in my opinion, is one opinion,

14   okay?  This is one opinion about materiality.  It's not two

15   separate opinions.  That's the point I'm getting at.  And you

16   haven't persuaded me that I'm wrong about that.  It's one

17   opinion and it's not two separate opinions.  It goes to

18   materiality.

19          So, in other words, of the five opinions that he says

20   he has, one -- two of them are actually one opinion on

21   materiality; and a third one was stipulated to, so we have a

22   total of three opinions, one of which is a preliminary opinion,

23   which is no opinion at all, which I'm about to get to.

24          Okay.  So, here's my ruling on these separate

25   opinions:

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | First of all, I find that the report fails to comply                     |
| 2  | with 26(a)(2)(B)(i), as I've said, because Famulari did not               |
| 3  | explain "the basis and reasons" for these opinions.                       |
| 4  | It's true that the report includes a long list of                         |
| 5  | information Mr. Famulari says he considered.  See pages 2 to 3             |
| 6  | and see the response to the insurance company's motion at page            |
| 7  | 6 to 7, noting and quoting "the extremely detailed list of                |
| 8  | facts, data and information considered by Mr. Famulari."  But             |
| 9  | the report doesn't specify how that information formed the                |
| 10 | basis for these opinions or which pieces of all of this                   |
| 11 | evidence informed each opinion.  The report doesn't explain               |
| 12 | Mr. Famulari's methodology at all or what his reasons for                 |
| 13 | coming to his opinions were.                                              |
| 14 | I'll also note that with respect to one of the                            |
| 15 | opinions, he, himself, writes that the opinion is only                    |
| 16 | preliminary.  I don't necessarily agree with Great Lakes that             |
| 17 | that opinion is the only one that's relevant to this case, but            |
| 18 | I do think it provides another basis on which to find that the            |
| 19 | report fails to comply with the rule.  "Many courts have                  |
| 20 | determined that 'preliminary' reports do not comply with                  |
| 21 | Rule 26(a)(2)(B)."  That's from *In Re:  Florida Cement &*                |
| 22 | *Concrete Antitrust Litigation,* 2011 WL 13174537, at 3, a                |
| 23 | Southern District of Florida case from 2011 by Judge~Altonaga             |
| 24 | and collecting lots of other cases holding exactly the same.              |
| 25 | See also *Acosta vs. Electrolux North America*, 2008 WL 42 --             |

1    5246160 -- let me say that again -- 5246160, at 5, a Southern

2    District of Florida case from 2008 by Judge Rosenbaum, now on

3    the Eleventh Circuit, noting that "a preliminary report does

4    not suffice under Rule 26" and, again, collecting similar

5    cases.

6         And that's because "experts reports must be detailed

7    and complete."  That's from the *Florida Cement & Concrete*

8    opinion at page 3, and they must not be "sketchy, vague or

9    preliminary in nature and the disclosures must not be used as a

10   means to extend the discovery deadline."  *Dyett*,

11   *D-Y-E-T-T*, *vs. North Broward County Hospital District*,

12   2001 WL 5320630, at page 1, an opinion by Judge Ungaro.

13        Although the Crabtrees say that Mr. Famulari "is

14   agreeable to providing expanded or supplemented testimony" --

15   that's from his response at page 5 -- and they also say that

16   Great Lakes "elected not to take the deposition of

17   Mr. Famulari" -- that's from page 6. -- neither of those things

18   is relevant to the Rule 26 analysis.  "An expert report

19   suffering from a major omission cannot be cured by the use of

20   supplementation."  That's from *Florida Cement & Concrete*, at 6.

21        Additionally, "an expert report must be complete such

22   that opposing counsel is not forced to depose an expert in

23   order to avoid ambush at trial; and, moreover, the report must

24   be sufficiently complete so as to shorten or decrease the need

25   for expert depositions and thus to conserve resources."  That's

1  from the *Dyett* opinion at page 1.  It's also from

2  *Rodriguez vs. Scottsdale Insurance Company*, 2021 WL 4902510, at

3  page 9, a 2021 opinion, "A party cannot meaningfully prepare

4  for and depose the opposing party's expert without an expert

5  report containing the information required by Rule 26.  In

6  fact, Rule 26(b)(4)(A) states that if Rule 26(a)(2)(B) requires

7  a report from the expert, the deposition may be conducted only

8  after the report is provided."

9       In short, the report submitted by Mr. Famulari is

10  insufficient under Rule 26(a)(2)(B).  The opinions he provides

11  are vague and, regardless of Mr. Famulari's listing of the many

12  documents that he reviewed, he gives us no explanation and,

13  more importantly, gives Great Lakes no explanation of the bases

14  or reasons for those opinions -- one of which is explicitly

15  preliminary.

16       I, therefore, think it's appropriate to grant Great

17  Lakes Insurance's motion to strike the expert, but I'm going to

18  do that without prejudice.

19       I'll note, given all the cases I just read,

20  Mr. Neblett, that I don't have to do that.  I'm doing it for

21  two reasons:  One, we're pretty far off in trial; two, I don't

22  think that it affects the summary judgment practice.  I

23  reviewed all that last night.  If you guys disagree, you tell

24  me.  But I didn't see his name pop up at all in the summary

25  judgment practice.  So that's the second reason for it.

1        The third is, it's just a bench trial.  So, when we

2   get to the bench trial, I can be more permissive with

3   evidentiary rulings in the first instance, and then say, if I

4   see something that pops up that I think should be excluded, I

5   can always exclude that later.  And that will go for you,

6   Mr. Neblett, when we talk about Ms. Goldman's expert as well.

7   A lot of these things can be dealt with at trial, because we're

8   not going to have a jury and I don't think we have to be afraid

9   of my biases and prejudices.

10       So, here's what I'm going to do.  I'm going to give

11  you, Mr. Neblett, about a week.  Does that sound fair?

12       MR. NEBLETT:  To -- to amend, Your Honor?

13       THE COURT:  I want you -- here's -- I'm going to be

14  very specific.  You are not permitted to add any opinions.

15  You're not permitted to change the opinions that were given.

16  You're only allowed now to state the three opinions that you

17  have, which is combining the two -- the other one is

18  stipulated, so it's gone -- and you need to directly tie for

19  each opinion -- you state the opinion and then below it say,

20  "in formulating this opinion, I looked at X, Y, and Z, and my

21  methodology was A, B, and C, and therefore I came to this

22  conclusion."  And you do that for each of the three opinions.

23  If you don't do that, the whole expert will be stricken and

24  we'll just move on without him.

25       Does that make sense?

```
 1          MR. NEBLETT:  Yes, Your Honor.  Could I maybe get a
 2   touch more time, because I haven't talked to Mr. Famulari --
 3          THE COURT:  Fourteen days?  How about 14 days?
 4          MR. NEBLETT:  I think that will work, Your Honor.
 5   Thank you.
 6          THE COURT:  All right.  Ms. Goldman, now that puts you
 7   in the position of, hey, maybe I want to depose him now, based
 8   on his methodology.  I don't know.  You chose not to depose him
 9   in the first instance, but I don't want to rob that opportunity
10   of you, because, to be honest, I could have easily stricken his
11   testimony entirely today, which I'm not going to do.  So, I do
12   want to give you time, once you've seen his methodology --
13   remember, there's not going to be a new opinion.  The opinions
14   have to stay static.  But I want to give you a few weeks to
15   say, hey, based on this new methodology that has been laid out,
16   I want to depose him or something like that unless you're
17   telling me today you just don't want that at all.  You let me
18   know, Ms. Goldman.
19          MS. GOLDMAN:  I believe we can't make that decision --
20   I apologize, Your Honor, I'm not sure we can make that decision
21   about whether or not we want to depose him until we see or
22   heard --
23          THE COURT:  I agree.  That's what I'm saying.
24          MS. GOLDMAN:  -- surprise, this new report is going to
25   be.
```

```
 1            Your Honor --

 2            THE COURT:  Not new report.  One second.  Not a new

 3   report.  I just want to be clear.  We're going to have no

 4   changes in the wording of the opinions except that one will be

 5   dropped, and two, dealing with materiality, will be combined

 6   into one.  So, we're going to have three total opinions and the

 7   wording cannot be changed.  I don't want added words, I don't

 8   want subtracted words, I don't want new opinions popping in or

 9   surprise opinions.

10            But I really can't rule on a Daubert motion when I

11   have no idea what the methodology was and what the baseline

12   underlying information was for each of the opinions that is

13   given.

14            Mr. Neblett has done, I guess, an admirable job today

15   of trying to explain what the bases for these opinions are, but

16   none of that appears in the report.  That needs to be in the

17   report.  That's what the report is for.

18            And I agree, Ms. Goldman, that you shouldn't have to

19   make that decision until you've seen it.  That's what I was

20   asking, do you want to waive it now or do you want to wait and

21   see it until you let me know whether you need more time to

22   depose it?  And I hear you saying, once you see the report,

23   you'll file a notice or a motion with me on the docket saying,

24   hey, can we have a hearing, I just want to -- you know, you

25   don't need a hearing, you can just file a motion for a
```

1  deposition or you could file a notice saying you intend to file

2  a deposition.  I think the motion is better because it triggers

3  action on my part.  And you can talk to, of course, Mr. Neblett

4  about that before.

5          Please remember to comply with Rule 7.1 before you

6  file any such motion -- which is to say, give Mr. Neblett a

7  call, see if you can agree to -- I don't know -- 30 minutes, an

8  hour, two hours, whatever it is, of deposition time, if that's

9  what you want to do, and when, so you don't have to involve me

10  unless it's absolutely necessary.

11          Does that all make sense from your perspective,

12  Mr. Neblett?

13          MR. NEBLETT:  Yes, Your Honor.

14          THE COURT:  Ms. Goldman?

15          MS. GOLDMAN:  Yes, Your Honor.

16          Except, I'm sorry, I'm not quite sure that I heard

17  you.  Did you say that the summary judgment papers did or did

18  not reply on Mr. Famulari's report?  Because -- because a

19  somewhat expanded declaration was provided by Mr. Famulari

20  attached to the opposition to summary judgment filed by the

21  defendants and he stated a lot of additional opinions.

22          THE COURT:  I know that.  But I didn't get the sense

23  that the response in opposition relied on those opinions in

24  arguing against summary judgment.  Didn't you get that sense?

25          MS. GOLDMAN:  I believe that defendants believe that

```
 1   it relied on his declaration.  I don't think that -- of course

 2   plaintiff believes that his opinions are not relevant.

 3          THE COURT:  Mr. Neblett, did you think that your

 4   opposition relied on Mr. Famulari, or not?

 5          MR. NEBLETT:  I mean, Your Honor, I think we filed it

 6   and the affidavit of our client.  But, again, I think it

 7   depends on sort of that discussion we're having earlier

 8   regarding the two steps.  So, I don't know if it matters

 9   depending on the opinion regarding materiality for both things

10   or those two steps.

11          THE COURT:  Okay.  Explain that to me a little bit

12   more.

13          MR. NEBLETT:  Again, we were talking about, is the

14   binder the policy?  And then after the policy, does it have to

15   become?  So, I think we -- again, it depends on what Your Honor

16   thinks about this first step, if you will, there are three

17   steps or two steps?

18          THE COURT:  Okay.  But whichever one I think is the

19   case, the question of whether it's material or not, which is

20   the opinion that he's giving, is that something that you're

21   relying on him for or that you're relying on your client for?

22          MR. NEBLETT:  Well, the client would be talking about

23   the production of documents and other things that we believe

24   would be, I guess, the third step, not the second step.  So, I

25   hate to keep going back to this three-step thing, but I think
```

```
 1   it depends on the Court's interpretation of how many steps

 2   there are.

 3            THE COURT:  And the steps being again what?

 4            MR. NEBLETT:  The binder, and is the binder actually

 5   the policy?  Or does it go binder, then the policy, then

 6   compliance?  So it's either two steps or three steps.

 7            THE COURT:  Ms. Goldman, do you agree with that?

 8            MS. GOLDMAN:  No, Your Honor.

 9            THE COURT:  I don't even understand what he's saying

10   but maybe you --

11            MS. GOLDMAN:  Neither do I, your Honor.  I apologize.

12   I'm reluctant to say anything, because I'm not -- I am

13   confused.

14            THE COURT:  So am I.

15            MR. NEBLETT:  Would you like me to explain, Your

16   Honor?  Here's a -- so our general position is that the

17   document that was provided that they're returning is the

18   binder, is the policy.  And there's no need for there to be

19   anything else, because they had all of the information that

20   they needed to bind the policy and they did that when they

21   issued, what they're calling the temporary binder.  They're

22   calling --

23            THE COURT:  I don't understand that point.  I don't

24   understand that point.

25            MR. NEBLETT:  I'm sorry?
```

```
 1              THE COURT:  Those are two different things.
 2              One is whether it was or was not the policy.  A
 3   separate thing is whether they had enough information to issue
 4   a hypothetical policy.  Aren't those two different things?
 5              MR. NEBLETT:  No.  Because our position is I think
 6   that once they issued the binder, that was the policy.
 7              THE COURT:  But what if they say -- but that has
 8   nothing to do with whether they had enough information to issue
 9   a policy?
10              MR. NEBLETT:  I think their position is they needed
11   this other stuff to determine if it was a policy or not.
12              THE COURT:  Well, that's what they're saying, they
13   wanted more information.
14              Are you denying that they wanted more information, by
15   the way?
16              MR. NEBLETT:  For -- again, for what?  I didn't -- I
17   think they wanted more information from what I would call the
18   post-loss compliance.
19              THE COURT:  They wanted more information.  Are you
20   agreeing with that?  I mean, what --
21              MR. NEBLETT:  Yes, Your Honor.
22              THE COURT:  -- I don't understand why you said --
23   okay.  So we don't have to, like, talk about allegation.  We --
24   they wanted more information.  The question is whether that
25   information was complied with, right?  That's one question.
```

1          MR. NEBLETT:  Correct.

2          THE COURT:  And this -- and he's not going to opine

3    one way or the other on that, is he?

4          MR. NEBLETT:  Yes, he will.

5          THE COURT:  I thought he gave -- is that the one where

6    he gives his preliminary opinion?

7          MR. NEBLETT:  Uhm, I believe so.  Because he says he

8    was going through the documents as to the compliance, the

9    document compliance.

10         THE COURT:  Okay.  So, so, what about the other

11   question, about whether it was -- the other question I suppose

12   is whether it was material or not to the formation of a

13   contract, right?

14         MR. NEBLETT:  Correct.

15         Can I give an example which might help?

16         THE COURT:  Sure.

17         MR. NEBLETT:  Okay.  So one of the things they're

18   saying wasn't done was that, let's say, a life jacket wasn't on

19   the boat.  So, there may be a dispute factually whether there

20   was a life jacket on the boat or not, but there's also a

21   dispute, does it even matter to give a policy of insurance or

22   to make a binder into a policy whether or not there was a life

23   jacket there?  So, there's factual issues --

24         THE COURT:  Again, why would he be able to say it

25   doesn't matter, when the insurance company says it matters to

1    us?

2           MR. NEBLETT:  Because he's going to say my experience

3    working with insurance companies, drafting policies, doing this

4    on the coverage side, on the defense side, is that it had

5    nothing to do with the loss and that the insurance company

6    doesn't care when they issue the binder, which is actually the

7    policy, that they could have asked that upfront, but it has

8    nothing to do with anything we're talking about here today.

9           THE COURT:  And that's true of all of the things that

10   they requested.

11          MR. NEBLETT:  Well, I think they're -- I think

12   plaintiff is going to dispute some of that, but I think they

13   actually agree that something like 46 of these items -- like

14   was there a sticker there -- has nothing to do with anything

15   and may have been requested, but it's not material.  Their

16   corporate representative agreed to that.  I think that's the

17   position they're taking.

18          But there's a lot of different things.  And it's

19   everything from a sticker to a life jacket, to fixing a part of

20   a mast -- I mean, there's a whole number of different issues.

21          THE COURT:  And he's going to say that a hundred

22   percent of them are irrelevant to whether this insurance

23   company issued the policy.

24          MR. NEBLETT:  No.  I think he's going to say,

25   depending on the timing, that they were either completed, in

37

```
 1   the process of being completed, or not material.
 2           THE COURT:  Okay.  So --
 3           MR. NEBLETT:  There's a range of them.  There's like
 4   hundreds of them.
 5           THE COURT:  So one hundred percent he's going to say
 6   were either completed or were not material.
 7           MR. NEBLETT:  Correct.
 8           THE COURT:  Okay.  All right.  And so is that an
 9   opinion that, if I allow it based on your supplementation, that
10   you're going to rely on at summary judgment?
11           MR. NEBLETT:  Yes.  Although I believe that
12   Mr. Crabtree also states the same thing.
13           THE COURT:  Okay.  So, in other words, you don't think
14   that we need to reopen that summary judgment motion, because
15   you've adequately laid out your position relying on what
16   Mr. Crabtree has said in your opposition.
17           MR. NEBLETT:  Except for, I guess, this materiality
18   thing and the two-step process, which I don't want to belabor.
19           MS. GOLDMAN:  Your Honor, that is addressed in
20   Mr. Famulari's declaration.
21           THE COURT:  Right.  So, I guess my question is, what
22   do the parties think about whether we should have Ms. Goldman
23   file a new motion for summary judgment, or not?
24           MS. GOLDMAN:  Your Honor, plaintiff would strenuously
25   object to that.
```

```
 1              THE COURT:  Well, the "strenuously" is an irrelevant
 2    word.  Do you object or not?
 3              MS. GOLDMAN:  Yes, we do object, Your Honor.
 4              THE COURT:  All right.  So, we're not having more
 5    summary judgment practice.  There it is.  I just thought that
 6    if you were going to have a new affidavit, that you were saying
 7    they were relying on -- let me ask you.  The new affidavit that
 8    was submitted at the time of the summary judgment practice,
 9    does it add opinions to the ones I've just described?
10              MS. GOLDMAN:  Yes, Your Honor.
11              THE COURT:  Okay.  Is that true?
12              MR. NEBLETT:  Your Honor, it would be our position
13    that it just defines them a little better, I think which was in
14    line with, you know, what you would like us to do with the
15    report itself.
16              THE COURT:  All right.  I'm striking the affidavit
17    that was attached to the opposition because that wasn't the
18    affidavit that was submitted in discovery.
19              What I'm going to do is this.  I'm going to give you
20    the two weeks to give us your methodology, list the information
21    that your expert relied upon in order to come out with his
22    opinions.  Again, he cannot change or add or supplement
23    opinions -- it's just methodology and underlying data.
24              Am I clear on that, Mr. Neblett?
25              MR. NEBLETT:  Yes, Your Honor.
```

1          THE COURT:  And then -- then we will hear from

2     Ms. Goldman about whether she thinks that she needs to depose

3     him or re-engage in summary judgment practice as a result of

4     this new methodology that's been proposed.

5          If I accept the methodology, then of course that will

6     be the methodology that we'll use and that will be the opinion

7     that we'll use in lieu of the one that was submitted by the

8     defense in opposition to summary judgment.  If I don't accept

9     it, then of course all of his opinions are stricken, so there's

10    no Mr. Famulari at all.

11         MR. NEBLETT:  And I think there may be some factual

12    disputes also in the affidavit.  So, I don't know if it would

13    be appropriate to strike the whole thing or I'm a little

14    unclear on that, Your Honor.

15         THE COURT:  What do you mean?

16         MR. NEBLETT:  I mean, I -- it's a pretty lengthy

17    affidavit.  I believe it four pages long, but it goes through a

18    number of different aspects.  So, I'm not sure if you would

19    want us to amend it, but I don't know if it would be

20    appropriate to strike the whole thing.

21         THE COURT:  You're talking about the affidavit in

22    response to summary judgment?

23         MR. NEBLETT:  Yes.  Yes, Your Honor.

24         THE COURT:  Oh, I'm just talking about the opinions

25    that differ from the opinions that were turned over at the time

1   of discovery.

2          You look very confused.

3          MR. NEBLETT:  Yes, Your Honor.

4          THE COURT:  Let me just quote you again.  We can have

5   Fran read it back.

6          Mr. Neblett, you said now in court, in open court,

7   that you submitted an affidavit post-discovery -- I'm getting

8   very close to just striking all of Mr. Famulari, but I'm going

9   to try to reiterate this one more time for you, Mr. Neblett, so

10  pay close attention.

11         You said just a moment ago that Mr. Famulari had

12  original opinions.  Those were disclosed at the time of

13  discovery.  I've now said that those were improperly supported

14  and that they laid out no methodology and they never pointed

15  out what the basis for those opinions were, so that is

16  stricken.  And I'm giving you, or I thought I was going to give

17  you, more time out of the goodness of my heart to try to fix

18  that error.

19         You then said, of your own -- of your own volition,

20  you decided, because you probably looked at the report and

21  realized all the deficiencies that Ms. Goldman and I have

22  identified were there, you decided on your own that you were

23  going to supplement -- I think that's the word you used -- and

24  make more fulsome -- I think that's another word you used --

25  the opinions that were given during discovery in an affidavit

1  you submitted in opposition to summary judgment, which is

2  totally improper.

3          Did I get that all right so far?

4          MR. NEBLETT:  I believe so, Your Honor.

5          THE COURT:  Okay.  So those "more fulsome,

6  supplemented opinions" that were never turned over in discovery

7  and that are totally improper are stricken from the affidavit.

8  They can be replaced, okay, they can be replaced at a

9  subsequent time by the opinions of Mr. Famulari's discovery

10 report, the one that was turned over in discovery, so long as I

11 find that those opinions are supported by proper methodology.

12 We're going to deal with that later.

13         But in order to do that, I have to actually get this

14 new report; I have to hear from Ms. Goldman about whether she

15 wants to dispose him or not; and then, I guess, Ms. Goldman can

16 at that time refile her *Daubert* motion with respect to that

17 report if she feels that that's appropriate.  Hopefully, there

18 won't be a 26 aspect of the *Daubert* motion, and maybe if

19 there's actually a methodology laid out, there won't be a

20 *Daubert* motion at all.  Who knows?

21         But the point is that whether or not that aspect of

22 Mr. Famulari's opposition can be filled in will be something

23 that we decide on at a later date.  And the other side of that

24 coin, of course, is, if I decide that there is no Famulari

25 expert opinion, then of course those aspects of that affidavit

1   just don't get filled in at all.

2          Does that all make sense, Mr. Neblett?

3          MR. NEBLETT:  Yes.  Thank you for that clarification,

4   Your Honor.  I understand.

5          THE COURT:  All right.  Now, moving on then to your

6   motion to strike Captain Allen, who is the defendant -- excuse

7   me -- the plaintiff's expert.

8          Okay.  The defendants have moved to strike the expert

9   report of Captain Ian D. Allen under the *Daubert* standard or,

10  in the alternative, based upon Rule 403 as "any probative value

11  is significantly and substantially outweighed by the danger of

12  unfair prejudice, confusing the issues, misleading the fact

13  finder, and are needlessly presenting cumulative evidence."

14  That's from ECF Number 119, at 9 to the 13.

15         I'm just denying outright the second part of that.

16  403 is an issue for trial.  I'll deal with that at trial.  And

17  confusing the issues, prejudicing the jurors, confusing the

18  jurors, those are all things we don't have to worry about

19  because we're not going to have a jury, it's just going to be

20  me, and I don't think we need to worry about me being

21  prejudiced against one side or the other because I hear a piece

22  of evidence and then strike it.  I'm of course happy to

23  instruct myself not to consider things that have been stricken.

24         In any event, Mr. Neblett, I'll just tell you that

25  when we get to trial, or the motion in limine phase, or at

1    trial, you hear a question that you think violates 403, you

2    hear a line of questioning that you think is not probative or

3    substantially outweighed by its prejudicial effect, just raise

4    an objection and we can deal with it at trial.  We'll have

5    plenty of time to deal with that since we won't have a jury.

6         All right.  So then we'll move on to the Daubert

7    question.  Captain Allen was retained on behalf of Great Lakes

8    to "render observations and opinions surrounding the post-loss

9    inspection of the Crabtrees' vessel and his opinion as to the

10   insurance compliance with certain preinsurance survey

11   recommendations."  That's ECF Number 119-1, paragraph 7.

12        Captain Allen is a "master mariner licensed by the

13   U.S. Coast Guard, Unlimited Upon Oceans, and holds a

14   Certificate of Equivalent Competency issued by the United

15   Kingdom, and he possesses a Bachelor's Degree of Science from

16   the U.S. Merchant Marine Academy.  That's from paragraph 2 of

17   his expert disclosure.

18        He also holds "a Certificate of Yacht and Small Craft

19   Surveying, Certificate of Completion from the Fundamentals of

20   Damage and Claims Survey and Advanced Damage and Claims Survey

21   from the Chapman School of Seamanship -- that's paragraph 4 --

22   and he holds the American Boating and Yacht Council's Standard

23   Certificate expiring on February 28, 2024 -- also paragraph 4.

24   He's worked as "a surveyor and adjustor for Arnold and

25   Arnold, Inc., since 2012 and has completed or been involved in

1 299 claim surveying or adjusting assignments.  That's

2 paragraph 5.

3          He "reviewed the color photographs of the fire, and

4 Concept Special Risks Temporary Binder Policies Number 174139

5 issued to the Crabtrees and three sets of documents totalling

6 2,931 pages provided by the Crabtrees.  That's paragraph 8.

7          The opinions he renders are "based on his review of

8 evidence listed above, as well as his educational background,

9 professional training and experience, and all the opinions

10 stated in the declaration are expressed to a reasonable degree

11 of certainty."  Paragraph 9.

12          After detailing the specific recommendations from the

13 Stetler survey that Captain Allen believes the Crabtrees failed

14 to comply with, Captain Allen provided the following opinions:

15 One, "I opine that Crabtrees or their insurance agent and the

16 broker had ample opportunity before and after the fire to

17 provide the documents and information required under the

18 temporary binder by the expiration of the date detailed of 24th

19 of May, 2019."  That's paragraph 38.

20          "The information the Crabtrees provided on the Letter

21 of Survey Recommendations Compliance, when signed on the 17th

22 of April, 2019, was very incomplete and inaccurate.

23 Considerable additional repairs should have been listed on the

24 form."  That's paragraph 39.

25          "Though the items are categorized" -- this is three --

1    "though the items are categorized as A, B, and C, according to

2    some degree of safety priority, all systems on any vessel

3    interlock.  Without disclosure of unrepaired items by the

4    insured or the broker, underwriters could not determine the

5    appropriate risk."  That's paragraph 40.

6            The fourth opinion is "though requested, the Crabtrees

7    were unable to" -- I guess that's a "sic" -- "or unwilling to

8    provide invoices, or direct us to vendors, to show that he had

9    completed the considerable work recommended in the summary of

10   findings prepared by a Surveyor Stetler."  Paragraph 41.

11           And "the facts were undisclosed, lacking and

12   misrepresented.  Thus I opine that policy 175139 was void from

13   inception."  That's paragraph 42.

14           The Crabtrees contend that "the opinions of Captain D.

15   Allen are not based upon scientifically reliable principles and

16   methodology, but instead are based upon subjective beliefs,

17   unsupported speculation, and a changed narrative that is not

18   factual in nature."  That's their motion at page 8.

19           The Crabtrees argue that Captain Allen isn't qualified

20   by noting that Great Lakes's only 30(b)(6) corporate rep. and

21   Mr. Allen, himself, specifically testified that Mr. Allen is

22   not a qualified expert and that he cannot testify as to

23   underwriting, policy interpretation, policy formation,

24   materiality, the law or prejudice" -- that's the Motion at 9 --

25   and "a cursory review of Mr. Allen's CV will also confirm that

1   Mr. Allen is not an expert on these issues, and that he's

2   unqualified as to any issues regarding policies of insurance,"

3   also page 9.

4         According to the Crabtrees, Mr. Allen's "lack of

5   relevant expertise was confirmed, under oath, by the

6   plaintiff's 30(b)(6) corporate rep. and by Mr. Allen himself.

7   Mr. Allen may be a fact witness with individual knowledge in

8   this matter, but he is not a qualified expert witness."  That's

9   the motion at page 10.

10         The Crabtrees argue that Mr. Allen "does not have the

11   requisite experience, as was admitted under oath by the

12   plaintiff's corporate rep. and by Mr. Allen himself, to even

13   reach the reliability prong.  Rather, his purported opinions

14   are based on little more than rank speculation, along with his

15   testimony, which tries to tell the fact finder how to interpret

16   facts and when to deem certain facts as important."

17         They argue that Captain's Allen's testimony would be

18   unhelpful and misleading because he "oddly presents his written

19   report in the form of an incorrect declaration.  The very form

20   of Mr. Allen's written report and improper declaration is yet

21   reason enough to find that Mr. Allen's declaration expert

22   report is unhelpful and risks confusing the finder of fact.

23   Thus, Mr. Allen's expert opinions and attempts to establish

24   favorable facts must be found as unhelpful, prejudicial,

25   cumulative, *inter alia*."  That's from page 13.

1          In its response, Great Lakes agrees with the Crabtrees

2    that most of Captain Allen's testimony should be limited, but

3    they do not agree that it should be stricken entirely.  That's

4    their response, ECF Number 122.

5          Great Lakes said that it will "stipulate that Captain

6    Allen's opinions as to the materiality of the incomplete

7    recommendation are not relevant and would not be admissible at

8    trial."  That's page 5 of their response.

9          That's because Great Lakes agrees that the Crabtrees

10   "are entirely correct," that "Captain Allen is not qualified to

11   opine as to 'underwriting, policy interpretation, policy

12   formation, materiality, the law or prejudice.'"  That's also

13   from page 5.

14         After making that concession, Great Lakes requests

15   that "Captain Allen not be stricken as an expert, but rather

16   that his expert testimony be limited to those areas which would

17   assist the trier of fact."  According to Great Lakes, "Captain

18   Allen's expert opinions as to whether the voluminous documents

19   produced by the defendants actually support their compliance

20   with the Stetler Survey recommendations rest on a reliable

21   foundation.  The defendants lack of any argument on this point

22   is an acknowledgment that his opinions on this issue are

23   unassailable.  As stated in his expert report, he was asked to

24   review all 2,931 pages produced by the defendants and he

25   concluded the documentary support for most of the

1    recommendations is lacking.  Nor do the defendants argue that

2    his opinions in this area would not be relevant or helpful to

3    the trier of fact.  His opinions could not be more relevant to

4    the tasks at hand because the plaintiff has sought this Court's

5    declaratory judgment that the defendants misrepresented their

6    compliance with those same recommendations."  That's page 7 of

7    their response.

8            Great Lakes then specifies that "only the testimony as

9    to the materiality of those incomplete recommendations that has

10   been or should be properly presented to this Court was that of

11   the unchallenged expert, Beric Anthony Usher, Senior

12   Underwriter and Managing Director of Concept.  That's also at

13   page 7.

14           In reply, the Crabtrees say that Great Lakes's limited

15   concession, that "Defendants (the Crabtrees) are entirely

16   correct regarding Mr. Allen's inability to testify as to

17   materiality does not absolve Great Lakes' improper attempt to

18   label Mr. Allen as its 'expert.'  The fact that Mr. Allen's

19   expert opinions were not relied upon in the plaintiff's motion

20   for summary judgment is of no legal or factual significance."

21   That's from pages 2-3 of the reply.  And they add, "Great

22   Lakes' statement that it will 'stipulate' and not rely upon

23   opinions as to 'materiality' of certain recommendations only

24   acts as an acknowledgment that many of the 'expert' opinions,

25   as contained improper declaration expert report are improper

1  and that the witness should be stricken entirely."  And that's

2  paragraph 3.

3          Let me ask you, Mr. Neblett, with respect to the only

4  opinion they want, which is that he reviewed all these

5  documents and has found that they didn't comply, isn't that

6  exactly the same thing you're proposing that your expert will

7  do, review the documents and find that they did comply or that

8  they weren't material?

9          MR. NEBLETT:  So I think it's similar, your Honor, but

10  our expert specializes in marine insurance and is an attorney

11  and can testify as to what compliance would be.  We believe

12  that Captain Allen can testify if something was received or

13  not, factually what he saw, but not how that applies to the

14  policy of insurance or the underwriting guidelines.

15          THE COURT:  They are not asking for that.  They are

16  asking now only for him to say I reviewed all 2,931 pages and

17  there were things that were required that weren't in there and

18  there were things that they said that they had done that also

19  weren't in there.  That he's perfectly qualified to do in my

20  opinion and that has nothing to do with interpreting legal

21  contracts.

22          MR. NEBLETT:  So, I agree, Your Honor.  If it's a

23  factual determination, I think that's appropriate.  It's making

24  that next step, is does that comply with the policy or the

25  requirements?  Is it material?  Because you don't have to

1    comply with --

2         THE COURT:  They're agreeing that he's not allowed to

3    testify as to materiality.  They're agreeing to that.  They're

4    just saying they want him to come in and say:  These were the

5    requirements of the Stetler Survey, these were, A; these were

6    the things that the Crabtrees said -- and I guess promised that

7    they had done -- B; and then C, I reviewed all the 2,931 pages

8    and there are a bunch of things in bucket A and bucket B that

9    aren't reflected there.

10        And he's got enough of a knowledge base in this

11   industry to understand, in the way that maybe I don't, and that

12   may be helpful to me, why certain things were not included.  In

13   other words, he might be able to interpret certain of these

14   documents as complying or not complying, and I'll take his

15   opinion and I'll decide for myself whether to believe him or

16   not.

17        All right.  Here's my analysis.  Great Lakes agrees

18   that Captain Allen's testimony as to the materiality of the

19   incomplete recommendations would be inadmissible and that he is

20   unqualified to opine as to any issues relating to underwriting,

21   policy interpretation, policy formation, materiality, the law,

22   and prejudice.  That's from their response at 5.  Since both

23   parties are in agreement on this, I will not permit Captain

24   Allen to testify as to any of these issues at trial and I'll

25   grant the Crabtrees' motion in that regard.

1    But I don't think it would be appropriate for me to

2 strike Captain Allen's opinions entirely.  Contra the

3 Crabtrees' position, I do think that his opinions on whether

4 the documents provided by the defendants suggest that they did

5 or did not comply with the recommendations in the Stetler

6 survey are relevant to the case and that it would be helpful

7 for me to know what he, a person in this industry, thinks on

8 this subject.

9    The Eleventh Circuit requires district courts to

10 consider a three-part inquiry to determine the admissibility of

11 expert testimony:  One, the expert must be qualified to testify

12 competently regarding the matters he intends to address; two,

13 the methodology by which the expert reaches his conclusions

14 must be sufficiently reliable as determined by the sort of

15 inquiry mandated in *Daubert*; and, three, the testimony must

16 assist the trier of fact through the application of scientific,

17 technical, or specialized expertise to understand the evidence

18 or to determine a fact in issue.  That's from *Hendrix ex rel.*

19 *G.P. vs. Evenflo Company*, 609 F.3d 1183, 1194, an Eleventh

20 Circuit case from 2010.

21    I think the insurance company has satisfied each of

22 these three factors:

23    First, qualification.  Based on the report, it's clear

24 that Captain Allen has extensive experience as a seaman and in

25 the marine industry and is a surveyor and adjustor in this

1   field.  That experience could help me, the trier of fact in

2   this case, better understand the documents the Crabtrees

3   provided.  And, as I've already noted, Captain Allen won't be

4   allowed to testify about any of those other issues about which

5   I think he's admittedly not an expert.

6        Second, methodology.  The methodology Captain Allen

7   used here is really very simple and he outlines that pretty

8   clearly in his report.  He reviewed the Stetler Survey, he

9   reviewed the binder, and he reviewed the statements,

10  representations the Crabtrees had made to the insurance company

11  and he compared those three things to the thousands of pages of

12  documents, 2,931 to be specific, that the defendants themselves

13  provided as support for their representations and their view of

14  whether they had completed the Stetler Survey's requirements or

15  not.

16       And that's really the only logical way to compare one

17  thing to another.  After comparing that, he found a lot of

18  holes, and he's going to get to tell us about those holes.  And

19  I think he's satisfied the methodology element.

20       Third, the helpfulness to the trier of fact.  To be

21  honest, I don't know how helpful it would be yet.  And that's

22  why I say, Mr. Neblett, when we get to trial, if I'm looking at

23  these documents and they are super clear and I don't need his

24  help in trying to understand what things were and were not

25  complied with, this is always without prejudice and you're

1    welcome to raise an objection at that time.

2         But from where I sit today, I think Captain Allen's

3    testimony, someone who has spent so much time in this industry,

4    could be quite helpful to me because given his extensive

5    experience in the field, he will be able to compare the

6    documents the Crabtrees themselves provided to the claims the

7    Crabtrees made and to opine about whether the documents support

8    those claims.  And I think the testimony would be highly

9    relevant to what Great Lakes says is a decisive issue in the

10   case.

11        Great Lakes' declaratory action again asks us to say

12   that it doesn't owe the Crabtrees anything under the temporary

13   binder.  It says, it's a temporary binder, because it was never

14   enforceable in part because the Crabtrees did not implement the

15   recommendations in the Stetler Survey -- a condition of the

16   contract, according to Great Lakes.  And so I think it's

17   relevant whether the documents the Crabtrees produced and the

18   ones that Captain Allen reviewed actually show that the

19   recommendations were or were not followed.

20        Again, I'll note that whether Captain Allen's

21   testimony would confuse the jury or bias or prejudice the jury,

22   if allowed in for a preliminary or limited purpose, and

23   stricken later, is really of no concern.  I've already granted

24   Great Lakes' motion for a bench trial.  There will be no jury

25   and so there's no need to worry about whether that jury may be

1   confused about how to interpret Captain Allen's testimony.

2         There's also very little chance I think of Captain

3   Allen prejudicing me.  I think I'm perfectly capable of keeping

4   my prejudices out of the trial.

5         Of course, as I said, Mr. Neblett, if during the trial

6   the Crabtrees identify certain aspects of Captain Allen's

7   testimony that they'd like to exclude on 403 grounds or some

8   other rule of evidence, the proper grounds for raising that

9   kind of objection would be at trial -- once I've seen the

10  evidence and can fit that particular piece of evidence into the

11  overall mosaic the parties have presented.

12        In short, Great Lakes Insurance Company's motion to

13  strike Expert David Famulari, ECF Number 116, is granted

14  without prejudice, because the report did not comply with the

15  strictures of Rule 26(a)(2)(B).  I'm going to give the

16  Crabtrees two weeks, as I said, to add more detail and

17  methodology to the three opinions that are left and are

18  relevant for Mr. Famulari.  The Crabtrees may not add any other

19  opinions to those three.

20        As to those opinions, they must submit a new report,

21  that:  One, explains exactly what pieces of evidence he

22  reviewed for each opinion; and, two, explains exactly what

23  methodology he applied for each opinion.  Great Lakes will then

24  have a chance -- let's say, I'll give you a week after you

25  review the report to file a motion or a notice on the docket

1    telling me whether you want to depose Mr. Famulari or not.  And

2    in that motion, please tell me whether you've complied with

3    Rule 7.1 and, if so, whether Mr. Neblett is in agreement, when

4    it's going to take place, how long, that kind of thing.

5           I'm not going to give you -- if she doesn't want to

6    depose and you can't agree on a date, I'm not going to give you

7    guys six months to dispose this guy.  I'm going to give you a

8    very limited time window, I'm going to tell you now.  I'll have

9    you work with the magistrate judge on that.  And if

10    Mr. Famulari isn't available during that window, then the

11    opinions will be stricken.  No other discovery will be

12    permitted unless by court order.

13           The Crabtrees' motion to strike the expert testimony

14    of Captain Ian Allen, ECF Number 119, is granted in part and

15    denied in part, consistent with this order.  Captain Allen will

16    not be allowed to testify as to the materiality of the

17    incomplete -- allegedly incomplete recommendations,

18    underwriting, policy interpretation, policy formation, the law

19    and/or prejudice.  He may, however, testify as to whether the

20    documents he reviewed show that the Crabtrees did or did not

21    implement the Stetler Survey's recommendations and that's my

22    ruling on both motions.

23           MS. GOLDMAN:  Your Honor?

24           THE COURT:  Anything else -- yes, ma'am.

25           MS. GOLDMAN:  Yes, I -- Your Honor, I apologize.  I'm

1  so sorry.  Please accept my apology.  There was one issue that

2  I forgot to mention during the review of the motion to strike

3  Mr. Famulari.  It was something we were not aware of when the

4  motion was initially filed, but it was referenced in the reply.

5        Mr. Famulari, I believe -- Mr. Neblett, correct me if

6  I'm wrong -- does he still work at Perry Neblett?

7        MR. NEBLETT:  No.  He hasn't worked here in like ten

8  years.

9        MS. GOLDMAN:  But he did previously.

10       MR. NEBLETT:  *(Nodding head affirmatively.)*

11       MS. GOLDMAN:  For how long?

12       THE COURT:  Hold on a second.  Wait, wait, one second,

13  before we get to that.

14       So what you're saying is, is that there was some

15  aspect that might be relevant to bias that was not included in

16  his report, is that what you're saying?

17       MS. GOLDMAN:  Yes, Your Honor.

18       THE COURT:  Okay.  Mr. Neblett, that's not a big deal.

19  You want to just include whatever the details of that were in

20  the new report that you're going to submit in 14 days?

21       MR. NEBLETT:  Sure.

22       THE COURT:  Just have one line, he worked for Perry

23  Neblett for X number of years, he was paid Y amount of money

24  every year, and he left us in whatever year that was.

25       MR. NEBLETT:  Okay.

```
1              MS. GOLDMAN:  Thank you, Mr. Neblett.  I wasn't aware
2     that he no longer worked for the firm.  It seems less of an
3     issue now, Your Honor.
4              THE COURT:  Okay.  Just still put it in there and that
5     way it doesn't come up again.
6              Okay.  So, those are my rulings on those.  Of course,
7     I still have the pending cross-motions that I will get to
8     probably next month.
9              Anything else from the plaintiff on this case?  I
10    assume we're nowhere -- well, I guess I should talk to you a
11    little bit about it.  Have we gotten anywhere closer to maybe
12    trying to resolve this case?  Do my rulings today help us along
13    in that regard at all?
14             Ms. Goldman, I'll hear from you first.
15             MS. GOLDMAN:  Unfortunately, no, Your Honor.  I don't
16    believe the circumstances have changed whatsoever as to
17    settlement.
18             THE COURT:  All right.  Mr. Neblett?
19             MR. NEBLETT:  We would always try to resolve the case,
20    Your Honor.  But we understand from plaintiffs that they are
21    waiting on the ruling on the motion for summary judgment.
22             THE COURT:  I understand.  Okay.
23             All right.  So, I'll look forward to hearing from you
24    about the new Famulari report.  And hopefully I won't have to
25    see you at that time, because you'll come to an agreement on
```

```
 1   whether there's going to be a deposition and, if so, where and
 2   when, or, you know, hopefully no deposition at all.
 3            MS. GOLDMAN:  Your Honor, in light of this three-week
 4   time that's been added, is there any possibility of postponing
 5   trial at this time?
 6            THE COURT:  I think it makes -- it probably will make
 7   sense.  When is it set now, remind me.
 8            MS. GOLDMAN:  Calendar call is currently set for
 9   August 9th with the trial period to begin on Monday the 15th.
10            THE COURT:  Okay.  Do you both want to push it back?
11            Let me hear from you, Mr. Neblett.
12            MR. NEBLETT:  We have no objection, Your Honor.
13            THE COURT:  I'll probably push it back anyway because
14   I'd like to spend a good deal of time working on the summary
15   judgment and the motion for judgment on the pleadings.  So I
16   think that make sense.  I'll enter a new trial order.  And of
17   course if that new date doesn't work, either side can file a
18   motion for a continuance.
19            MS. GOLDMAN:  Thank you.
20            THE COURT:  Anything else from the plaintiff?
21            MS. GOLDMAN:  No, Your Honor.  Thank you.
22            THE COURT:  Anything else from the defense?
23            MR. NEBLETT:  No, Your Honor.  Thank you very much.
24            THE COURT:  All right.  Thank you all very much.  Nice
25   to see you both.  Have a good day.
```

```
1              MS. GOLDMAN:  You, as well, Your Honor.  Thank you.

2              THE COURT:  All right.  Bye-bye.

3              Take care, Fran.

4              (The Judge exited the courtroom)

5              (Proceedings concluded at 2:14 p.m.)

6                        -  -  -  -  -

7

8

9

10

11

12

13

14

15

16

17

18                    C E R T I F I C A T E

19       I hereby certify that pursuant to Section 753,

20   Title 28, United States Code, the foregoing is a true and

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23       /s/Francine C. Salopek              8-10-2022
     _____    _____
24   Francine C. Salopek, RMR-CRR           Date
     Official Court Reporter
25
```

MR. NEBLETT: [76]
MS. GOLDMAN: [27]
MS. HARWOOD: [2]  3/14 19/15
THE COURT REPORTER: [1]  3/5
THE COURT: [100]

**$**

$250,000 [1]  4/14

**'**

'binder' [1]  8/7
'binders' [1]  6/16
'expert' [1]  48/24
'expert.' [1]  48/18
'materiality' [1]  48/23
'may' [1]  10/3
'opinions,' [1]  10/18
'preliminary [1]  10/23
'preliminary' [1]  25/20
'stipulate' [1]  48/22
'underwriting' [1]  47/11

**/**

/s/Francine [1]  59/23

**1**

10 [1]  46/9
11 [1]  2/6
116 [2]  5/4 54/13
116-2 [1]  7/1
1183 [1]  51/19
119 [3]  5/2 42/14 55/14
1194 [1]  51/19
122 [1]  47/4
13 [5]  1/7 3/1 7/8 42/14 46/25
13174537 [1]  25/22
136 [1]  4/24
14 [2]  29/3 56/20
15th [1]  58/9
174139 [1]  44/4
175 [1]  3/25
175139 [1]  45/12
17th [1]  44/21
1988 [1]  7/16
1990 [2]  7/5 7/18
1:03 [2]  1/8 3/1

**2**

2,931 [5]  44/6 47/24 49/16 50/7 52/12
2-3 [1]  48/21
20-81544-CIV-RKA [1]  1/4
20-CV-81544 [1]  3/7
200 [1]  7/9
200,000 [2]  20/23 22/18
2001 WL 5320630 [1]  26/12
2008 [1]  26/2
2008 WL 42 [1]  25/25
2010 [1]  51/20
2011 [1]  25/23
2011 WL 13174537 [1]  25/22
2012 [1]  43/25
2019 [1]  44/19 44/22
2021 [1]  27/3

2021 WL 4902510 [1]  27/2
2022 [3]  1/7 3/1 59/23
2024 [1]  43/23
207 [1]  2/10
24th [1]  44/18
250 [2]  20/23 21/1
250K [1]  14/16
2550 [1]  2/6
26 [16]
28 [2]  43/23 59/20
299 [2]  2/10 44/1
2:14 [1]  59/5

**3**

30 [4]  23/4 31/7 45/20 46/6
301-3276 [1]  2/11
305 [1]  2/11
3276 [1]  2/11
33133 [1]  2/7
33301 [1]  2/11
33324 [1]  2/4
34 [1]  4/9
35 [1]  20/10
38 [1]  44/19
39 [1]  44/24

**4**

40 [1]  45/5
403 [4]  42/10 42/16 43/1 54/7
4040 [1]  2/3
41 [1]  45/10
42 [2]  25/25 45/13
46 [1]  36/13
4902510 [1]  27/2

**5**

5246160 [2]  26/1 26/1
5320630 [1]  26/12

**6**

609 F.3d 1183 [1]  51/19
6th [1]  4/1

**7**

7.1 [2]  31/5 55/3
753 [1]  59/19

**8**

8-10-2022 [1]  59/23
81544 [1]  3/7
8751 [1]  2/3

**9**

905 [1]  8/1
9th [1]  58/9

**A**

above [2]  44/8 59/22
above-entitled [1]  59/22
absolutely [1]  31/10
absolve [1]  48/17
Academy [1]  43/16
accept [3]  39/5 39/8 56/1
accompanied [1]  9/1
according [9]  5/12 5/21 6/10 10/2

10/10 45/1 46/4 47/17 53/16
acknowledgment [2]  47/22 48/24
Acosta [1]  25/25
Acosta vs. Electrolux [1]  25/25
Act [2]  7/16 7/24
action [2]  31/3 53/11
acts [1]  48/24
add [6]  28/14 38/9 38/22 48/21 54/16
 54/18
added [2]  30/7 58/4
address [1]  51/12
addressed [1]  37/19
adequately [1]  37/15
adjusting [2]  6/19 44/1
adjustor [2]  43/24 51/25
adjustors [2]  6/23 11/13
adjustors/agents [1]  11/13
admirable [1]  30/14
admiralty [4]  4/18 7/4 9/20 20/14
admissibility [1]  51/10
admissible [1]  47/7
admits [2]  10/2 15/12
admitted [1]  46/11
admittedly [1]  52/5
Advanced [1]  43/20
affects [1]  27/22
affidavit [12]
affirmatively [1]  56/10
afraid [1]  28/8
afternoon [5]  3/8 3/10 3/12 3/14 3/16
agency [4]  6/16 6/17 6/23 11/10
agent [3]  12/3 12/13 44/15
agents [2]  11/10 11/13
agree [11]  11/2 24/1 25/16 29/23
 30/18 31/7 33/7 36/13 47/3 49/22
 55/6
agreeable [1]  26/14
agreed-value [1]  14/15
agreement [3]  50/23 55/3 57/25
agreements [1]  12/25
agrees [3]  47/1 47/9 50/17
al [2]  1/10 3/6
alert [1]  4/4
alia [1]  46/25
allegation [1]  34/23
allegedly [2]  23/13 55/17
alleging [1]  22/3
Allen [27]
Allen's [17]
allow [1]  37/9
allowed [5]  28/16 50/2 52/4 53/22
 55/16
alternative [1]  42/10
Although [3]  11/1 26/13 37/11
Altman [1]  1/17
Altonaga [1]  25/23
ambush [1]  26/23
amend [3]  11/15 28/12 39/19
Amended [1]  4/15
America [1]  25/25
American [1]  43/22
amount [2]  15/1 56/23
ample [1]  44/16
analysis [2]  26/18 50/17
Answer [1]  4/15

**A**

ante [1]  23/10
Anthony [1]  48/11
Antitrust [1]  25/22
apologize [3]  29/20 33/11 55/25
apology [1]  56/1
APPEARANCES [1]  2/1
application [5]  6/4 6/25 8/20 20/18
 51/16
applications [3]  4/21 6/17 20/12
applied [1]  54/23
applies [1]  49/13
appreciate [1]  4/5
April [1]  44/22
area [1]  48/2
areas [1]  47/16
aren't [2]  34/4 50/9
argue [6]  10/7 18/12 45/19 46/10
 46/17 48/1
argues [1]  9/22
arguing [2]  4/18 31/24
argument [2]  10/7 47/21
Arnold [1]  43/24
Arnold, [1]  43/25
Arnold, Inc [1]  43/25
arrive [1]  11/19
arrived [2]  5/18 9/19
aspect [3]  41/18 41/21 56/15
aspects [4]  6/12 39/18 41/25 54/6
assessing [1]  7/20
assignments [1]  44/1
assist [3]  5/11 47/17 51/16
assume [1]  57/10
attached [2]  31/20 38/17
attempt [1]  48/17
attempts [1]  46/23
attending [1]  7/7
attorney [3]  9/21 20/14 49/10
August [1]  58/9
authored [2]  8/9 9/10
average [1]  7/8
avoid [1]  26/23
aware [3]  12/24 56/3 57/1

**B**

Bachelor's [1]  43/15
background [1]  44/8
Bar [1]  7/5
base [1]  50/10
baseline [1]  30/11
bases [3]  14/7 27/13 30/15
basis [8]  5/16 9/6 11/6 12/15 25/3
 25/10 25/18 40/15
Bayshore [1]  2/6
begin [1]  58/9
beginning [1]  22/8
belabor [1]  37/18
beliefs [1]  45/16
believe [19]
believes [2]  32/2 44/13
below [1]  28/19
bench [5]  4/23 4/24 28/1 28/2 53/24
Beric [1]  48/11
Bethea [1]  2/8

beyond [2]  9/19 17/7
bias [2]  53/21 56/15
biases [1]  28/9
bills [1]  6/19
bind [1]  33/20
binder [35]
binder's [2]  21/9 22/10
blank [2]  19/1 19/1
Blvd [1]  2/10
board [2]  7/4 20/13
boat [12]
boat's [1]  23/8
Boating [1]  43/22
boats [1]  7/10
Boulevard [1]  2/3
brain [1]  20/3
briefing [1]  3/18
briefs [1]  3/22
broker [12]
brokerage [1]  12/25
brokers [4]  11/11 11/24 12/21 12/24
Broward [2]  2/3 2/10 26/11
BRYAN [1]  1/10
bucket [2]  50/8 50/8
bunch [2]  12/7 50/8
Burns [2]  12/5 13/1
business [1]  11/10
bye [2]  59/2 59/2
Bye-bye [1]  59/2

**C**

Calendar [1]  58/8
call [5]  3/4 21/7 31/7 34/17 58/8
called [1]  17/23
calling [2]  33/21 33/22
capable [1]  54/3
captain [29]
Captain's [1]  46/17
careful [1]  11/7
cargo [1]  8/2
categorized [2]  44/25 45/1
cause [1]  6/18
caveats [2]  15/21 23/13
Cement [3]  25/21 26/7 26/20
certainty [1]  44/11
Certificate [4]  43/14 43/18 43/19
 43/23
certified [2]  7/4 20/13
certify [1]  59/19
chance [3]  11/15 54/2 54/24
Chapman [1]  43/21
charitably [1]  10/18
chose [1]  29/8
Circuit [3]  26/3 51/9 51/20
circumstances [1]  57/16
CIV [1]  1/4
Civil [1]  5/8
claim [4]  5/13 14/7 15/16 44/1
claiming [1]  18/16
claims [18]
clarification [1]  42/3
clear [5]  13/9 30/3 38/24 51/23 52/23
client [5]  12/9 23/2 32/6 32/21 32/22
close [2]  40/8 40/10
closer [1]  57/11

Coast [2]  7/14 43/13
Code [1]  59/20
coin [1]  41/24
collecting [2]  25/24 26/4
collisions [1]  7/25
color [1]  44/3
combat [1]  19/2
combined [1]  30/5
combining [1]  28/17
comfortable [2]  19/18 19/19
commercial [2]  7/7 7/20
companies [7]  6/22 6/22 7/13 20/8
 20/11 20/15 36/3
company [14]
company's [2]  25/6 54/12
compare [2]  52/16 53/5
compared [1]  52/11
compensation [1]  9/14
Competency [1]  43/14
competently [1]  51/12
Complaint [2]  4/15 4/22
complete [6]  9/5 10/23 11/5 26/7
 26/21 26/24
completed [10]  6/6 8/14 10/20 13/19
 36/25 37/1 37/6 43/25 45/9 52/14
completing [3]  6/6 8/14 13/19
Completion [1]  43/19
compliance [21]
complicated [1]  24/10
complied [9]  5/25 8/19 9/24 10/3
 13/25 19/25 34/25 52/25 55/2
comply [18]
complying [2]  50/14 50/14
computer [1]  1/25
Concept [2]  44/4 48/12
concern [1]  53/23
concession [2]  47/14 48/15
concluded [2]  47/25 59/5
conclusion [2]  5/16 28/22
conclusions [1]  51/13
Concrete [3]  25/22 26/7 26/20
condition [2]  17/17 53/15
conditions [2]  15/14 16/21
conducted [1]  27/7
confirm [1]  45/25
confirmed [1]  46/5
confuse [1]  53/21
confused [6]  15/11 22/6 23/1 33/13
 40/2 54/1
confusing [6]  42/12 42/17 42/17 46/22
conserve [1]  26/25
considerable [2]  44/23 45/9
consistent [1]  55/15
consists [1]  7/23
construed [1]  11/8
consulted [1]  7/13
contain [1]  9/5
contained [2]  10/11 48/25
containing [1]  27/5
contend [1]  45/14
contending [2]  15/12 16/24
contends [2]  9/16 10/17
contentions [1]  12/10
contest [1]  12/4
continuance [1]  58/18

**C**

Contra [1]  51/2
contract [5]  17/17 17/22 18/21 35/13 53/16
contracts [1]  49/21
corporate [8]  18/23 19/21 20/22 22/17 36/16 45/20 46/6 46/12
Council's [1]  43/22
counsel [1]  26/22
country [1]  11/24
County [1]  26/11
court [10]  1/1 2/9 2/9 2/10 8/25 40/6 40/6 48/10 55/12 59/24
Court's [2]  33/1 48/4
courtroom [1]  59/4
courts [2]  25/19 51/9
coverage [5]  4/20 6/24 8/3 20/9 36/4
CRABTREE [5]  1/10 2/8 3/6 37/12 37/16
Crabtrees [43]
Crabtrees' [11]  4/12 5/1 5/7 6/8 8/16 13/11 13/21 43/9 50/25 51/3 55/13
Craft [1]  43/18
create [1]  7/15
creates [1]  24/6
cross [3]  3/17 18/14 57/7
cross-motions [2]  3/17 57/7
cross-talking [1]  18/14
CRR [2]  2/9 59/24
cumulative [2]  42/13 46/25
cured [1]  26/19
cursory [1]  45/25
CV [2]  3/7 45/25

**D**

D-Y-E-T-T, vs. North [1]  26/11
damage [4]  8/2 8/2 43/20 43/20
damaged [1]  4/12
danger [1]  42/11
data [5]  9/7 10/14 11/18 25/8 38/23
date [5]  41/23 44/18 55/6 58/17 59/24
Daubert [9]  5/7 11/17 30/10 41/16 41/18 41/20 42/9 43/6 51/15
David [4]  2/5 3/14 5/6 54/13
deadline [2]  23/5 26/10
dealt [1]  28/7
decide [4]  16/25 41/23 41/24 50/15
decided [2]  40/20 40/22
decision [4]  22/1 29/19 29/20 30/19
decisive [1]  53/9
declaration [8]  31/19 32/1 37/20 44/10 46/19 46/20 46/21 48/25
declaratory [3]  4/18 48/5 53/11
decrease [1]  26/24
deem [1]  46/16
defendant [2]  2/5 42/6
defendant -- excuse [1]  42/6
defendants [17]
defendants' [2]  4/15 5/3
defense [8]  3/13 7/24 12/19 20/9 20/14 36/4 39/8 58/22
deficiencies [1]  40/21
deficient [2]  11/16 11/17
degree [3]  43/15 44/10 45/2

delivered [1]  12/4
denial [1]  14/7
denied [1]  55/15
denying [2]  34/14 42/15
depending [2]  32/9 36/25
depends [4]  21/13 32/7 32/15 33/1
depose [10]  26/22 27/4 29/7 29/8 29/16 29/21 30/22 39/2 55/1 55/6
deposition [8]  9/13 26/16 27/7 31/1 31/2 31/8 58/1 58/2
depositions [1]  26/25
described [1]  38/9
detail [1]  54/16
detailed [4]  10/14 25/7 26/6 44/18
details [1]  56/19
determination [2]  20/25 49/23
determine [8]  17/13 17/14 18/4 20/11 34/11 45/4 51/10 51/18
determined [2]  25/20 51/14
develop [1]  20/8
developing [1]  7/12
difference [2]  16/17 21/18
direct [2]  3/25 45/8
directly [2]  21/12 28/18
Director [1]  48/12
disagree [1]  27/23
disagreement [1]  22/12
disclosed [1]  40/12
disclosure [13]
disclosures [1]  26/9
discovery [11]  8/11 26/10 38/18 40/1 40/7 40/13 40/25 41/6 41/9 41/10 55/11
discusses [1]  18/11
discussion [2]  3/3 32/7
dispose [2]  41/15 55/7
dispute [5]  4/12 12/5 35/19 35/21 36/12
disputes [1]  39/12
disputing [2]  14/3 14/11
distinction [1]  22/8
district [8]  1/1 1/2 1/18 2/10 25/23 26/2 26/11 51/9
DIVISION [1]  1/3
dock [1]  8/2
docket [2]  30/23 54/25
document [3]  21/14 33/17 35/9
documentary [1]  47/25
documents [23]
drafting [1]  36/3
Drive [1]  2/6
dropped [1]  30/5
duties [1]  9/3
duty [1]  4/19
Dyett [2]  26/10 27/1

**E**

easily [1]  29/10
easy [1]  14/13
ECF [11]  4/9 4/24 5/1 5/3 6/9 7/1 42/14 43/11 47/4 54/13 55/14
educational [1]  44/8
effect [3]  6/2 14/16 43/3
effectuated [2]  11/12 22/1
elected [1]  26/16

Electrolux [1]  25/25
elects [1]  13/1
element [1]  52/19
elements [2]  18/10 23/15
Eleventh [3]  26/3 51/9 51/19
emphasis [1]  6/12
employed [1]  9/2
employee [1]  9/4
enforceable [1]  53/14
engage [1]  39/3
engaged [1]  19/24
engine [1]  8/2
England [1]  7/19
enter [1]  58/16
entirely [6]  29/11 47/3 47/10 48/15 49/1 51/2
entitled [2]  17/21 59/22
Equivalent [1]  43/14
error [1]  40/18
Esq [2]  2/2 2/5
establish [1]  46/23
et [2]  1/10 3/6
Evenflo [1]  51/19
event [5]  5/23 8/17 13/23 15/22 42/24
evidence [11]  11/2 15/19 25/11 42/13 42/22 44/8 51/17 54/8 54/10 54/10 54/21
evidenced [2]  6/1 14/16
evidentiary [1]  28/3
ex [2]  23/10 51/18
ex rel [1]  51/18
exclude [2]  28/5 54/7
excluded [1]  28/4
excuse [2]  5/19 42/6
exhibits [1]  9/8
exited [1]  59/4
expanded [2]  26/14 31/19
expansive [1]  11/1
experience [9]  7/3 9/20 13/12 36/2 44/9 46/11 51/24 52/1 53/5
expert [55]
expertise [3]  5/17 46/5 51/17
experts [2]  3/18 26/6
expiration [1]  44/18
expiring [1]  43/23
explain [9]  11/16 11/21 13/3 23/10 25/3 25/11 30/15 32/11 33/15
explains [2]  54/21 54/22
explanation [2]  27/12 27/13
explicitly [1]  27/14
express [2]  9/6 11/5
expressed [1]  44/10
extend [1]  26/10
extensive [3]  7/2 51/24 53/4
extra [1]  19/6
extremely [2]  10/14 25/7

**F**

F.3d [1]  51/19
fact [15]
factors [1]  51/22
facts [5]  4/9 4/16 9/7 10/14 25/8 45/11 46/16 46/16 46/24
factual [5]  35/23 39/11 45/18 48/20 49/23

**F**

factually [2]  35/19 49/13
failed [2]  4/19 44/13
fails [4]  10/4 11/3 25/1 25/19
faith [1]  6/24
Famulari [33]
Famulari's [16]
favorable [1]  46/24
February [1]  43/23
Federal [1]  5/8
field [2]  52/1 53/5
file [8]  30/23 30/25 31/1 31/1 31/6
 37/23 54/25 58/17
filed [7]  4/4 4/13 4/25 5/2 31/20 32/5
 56/4
filing [1]  3/25
filled [2]  41/22 42/1
finder [3]  42/13 46/15 46/22
findings [1]  45/10
fine [1]  16/16
fire [5]  4/13 23/3 23/8 44/3 44/16
firm [1]  7/12
fisheries [2]  7/12 7/12
fishing [3]  7/8 7/14 7/16
fit [1]  54/10
fix [1]  40/17
fixing [1]  36/19
flatly [1]  10/8
FLORIDA [12]
force [2]  6/2 14/16
forced [1]  26/22
foregoing [1]  59/20
forgot [1]  56/2
form [3]  44/24 46/19 46/19
formation [6]  23/16 35/12 45/23 47/12
 50/21 55/18
formulate [1]  13/14
formulating [1]  28/20
Fort [1]  2/11
fortuitous [3]  5/23 8/17 13/23
fortuity [1]  14/4
foundation [1]  47/21
Fourteen [1]  29/3
fourth [1]  45/6
framework [1]  7/15
Fran [3]  3/4 40/5 59/3
Francine [3]  2/9 59/23 59/24
Ft [1]  2/4
fulfilled [1]  15/21
fulsome [2]  40/24 41/5
Fundamentals [1]  43/19

**G**

G.P [1]  51/19
general [3]  9/19 11/22 33/16
gives [4]  8/13 27/12 27/13 35/6
Goldman [17]
Goldman's [1]  28/6
goodness [1]  40/17
gotten [1]  57/11
graduating [1]  7/18
grant [2]  27/16 50/25
granted [4]  4/22 53/23 54/13 55/14
Granting [1]  4/23

**GREAT [48]**
grounds [2]  54/7 54/8
Guard [1]  7/14 43/13
guidelines [2]  8/7 49/14

**H**

hallmark [2]  19/22 22/15
hand [1]  48/4
handling [1]  6/24
hands [2]  7/2 17/9
hands-on [1]  7/2
happy [1]  42/22
hate [1]  32/25
head [1]  56/10
hear [11]  15/8 16/14 17/1 30/22 39/1
 41/14 42/21 43/1 43/2 57/14 58/11
heard [2]  29/22 31/16
hearing [5]  1/16 17/8 30/24 30/25
 57/23
heart [1]  40/17
Hellman [1]  2/2
help [4]  35/15 52/1 52/24 57/12
helped [1]  7/15
helpful [5]  48/2 50/12 51/6 52/21 53/4
helpfulness [1]  52/20
Hendrix [1]  51/18
here's [6]  5/20 24/24 28/10 28/13
 33/16 50/17
hereby [1]  59/19
hey [3]  29/7 29/15 30/24
highly [1]  53/8
hired [1]  11/13
Hold [1]  56/12
holding [1]  25/24
holes [2]  52/18 52/18
honest [2]  29/10 52/21
Honor [55]
Honorable [1]  1/17
hopefully [3]  41/17 57/24 58/2
Hospital [1]  26/11
hour [1]  31/8
hours [1]  31/8
hundred [2]  36/21 37/5
hundreds [1]  37/4
hypothetical [1]  34/4

**I**

I'd [1]  58/14
I'll [15]
I'm [46]
I've [6]  25/2 38/9 40/13 52/3 53/23
 54/9
Ian [2]  42/9 55/14
idea [1]  30/11
identified [1]  40/22
identify [2]  10/4 54/6
identifying [1]  10/24
impermissible [1]  5/16
implement [2]  53/14 55/21
imposed [2]  23/13 23/13
improper [6]  41/2 41/7 46/20 48/17
 48/25 48/25
improperly [1]  40/13
in limine [1]  42/25
In Re [1]  25/21

inability [1]  48/16
inaccurate [1]  44/22
inadmissible [1]  50/19
Inc [1]  43/25
inception [2]  15/15 45/13
incident [1]  8/10
include [2]  11/4 56/19
included [3]  20/5 50/12 56/15
includes [2]  10/14 25/4
including [3]  7/24 8/7 9/10
incomplete [6]  44/22 47/6 48/9 50/19
 55/17 55/17
incorrect [2]  10/9 46/19
individual [1]  46/7
industry [9]  6/12 7/3 11/23 13/7 13/9
 50/11 51/7 51/25 53/3
information [49]
informed [1]  25/11
Initial [1]  6/8
initially [1]  56/4
inquiry [3]  11/18 51/10 51/15
inspection [1]  43/9
instance [4]  17/12 19/1 28/3 29/9
instead [1]  45/16
instruct [1]  42/23
instructive [1]  4/3
insufficient [2]  5/9 27/10
insurance [45]
Insurance's [1]  27/17
insured [5]  4/14 20/23 22/16 22/17
 45/4
insurer [1]  5/5
insurers [3]  8/4 12/18 12/21
intend [1]  31/1
intends [1]  51/12
inter [1]  46/25
inter alia [1]  46/25
interlock [1]  45/3
interpretation [6]  18/22 33/1 45/23
 47/11 50/21 55/18
interpreting [1]  49/20
investigation [1]  8/10
invoices [1]  45/8
irrelevant [5]  16/7 17/24 19/18 36/22
 38/1
issue [27]
issued [9]  4/11 17/19 18/18 20/4
 33/21 34/6 36/23 43/14 44/5
issues [19]
items [6]  10/23 19/21 36/13 44/25
 45/1 45/3

**J**

jacket [4]  35/18 35/20 35/23 36/19
Jacqueline [2]  2/3 3/10
job [1]  30/14
Jones [1]  7/24
judge [8]  1/18 3/2 3/5 25/23 26/2
 26/12 55/9 59/4
judgment [19]
July [3]  1/7 3/1 4/1
jurors [2]  42/17 42/18
jury [7]  28/8 42/19 43/5 53/21 53/21
 53/24 53/25

**K**

keeping [1]  54/3
ken [1]  17/7
kinds [1]  13/1
Kingdom [1]  43/15
knowledge [2]  46/7 50/10
knows [2]  20/10 41/20

**L**

label [1]  48/18
labor [1]  6/21
lack [5]  5/10 6/13 8/7 46/4 47/21
lacking [2]  45/11 48/1
laid [4]  29/15 37/15 40/14 41/19
LAKES [36]
Lakes' [6]  4/23 11/9 48/17 48/22
 53/11 53/24
Lakes's [6]  5/5 10/7 11/12 13/11
 45/20 48/14
Lauderdale [2]  2/4 2/11
law [10]  7/4 7/7 7/18 7/21 18/11 18/14
 45/24 47/12 50/21 55/18
laws [1]  8/12
lay [2]  10/5 13/12
legal [4]  5/16 7/23 48/20 49/20
lengthy [1]  39/16
Letter [2]  9/25 44/20
liability [2]  7/25 8/1
licensed [1]  43/12
lieu [1]  39/7
life [4]  35/18 35/20 35/22 36/19
light [1]  58/3
limine [1]  42/25
limitation [1]  7/25
limited [5]  47/2 47/16 48/14 53/22
 55/8
lines [1]  12/23
list [6]  9/10 9/11 10/14 25/4 25/7
 38/20
listen [1]  20/22
literally [1]  24/6
Litigation [1]  25/22
lobster [1]  7/9
logical [1]  52/16
longshore [1]  8/1
loss [28]

**M**

Mackenzie [1]  2/8
magistrate [1]  55/9
main [3]  12/2 12/10 18/11
major [2]  7/19 26/19
managed [1]  7/9
management [1]  7/12
Managing [1]  48/12
mandated [1]  51/15
marina [1]  8/1
marine [13]
mariner [1]  43/12
maritime [3]  7/4 7/21 7/24
market [2]  6/20 6/21
mast [1]  36/20
master [1]  43/12
material [27]

materiality [25]
matter [6]  18/21 24/13 35/21 35/25
 46/8 59/22
matters [3]  32/8 35/25 51/12
mean [7]  13/5 17/21 32/5 34/20 36/20
 39/15 39/16
meaningfully [1]  27/3
means [2]  15/14 26/10
mechanical [1]  1/24
meet [1]  9/17
member [1]  7/5
Merchant [1]  43/16
merits [1]  16/25
methodology [24]
MIAMI [3]  1/3 1/7 2/7
middle [1]  12/7
minutes [1]  31/7
misleading [2]  42/12 46/18
misrepresentation [1]  8/20
misrepresentations [4]  4/21 6/4 15/22
 20/18
misrepresented [2]  45/12 48/5
mitigation [1]  6/19
moment [1]  40/11
Monday [1]  58/9
money [2]  55/1 56/23
month [1]  57/8
months [1]  55/7
mosaic [1]  54/11
motion [40]
motions [4]  3/17 5/4 55/22 57/7
move [2]  28/24 43/6
moved [1]  42/8
moves [1]  5/6
moving [1]  42/5
Mr. [83]
Mr. Allen [5]  45/21 46/1 46/6 46/7
 46/10
Mr. Allen as [1]  48/18
Mr. Allen himself [1]  46/12
Mr. Allen is [1]  45/21
Mr. Allen's [7]  45/25 46/4 46/20 46/21
 46/23 48/16 48/18
Mr. Crabtree [2]  37/12 37/16
Mr. Famulari [25]
Mr. Famulari's [13]
Mr. Neblett [28]
Ms. [15]
Ms. Goldman [14]
Ms. Goldman's [1]  28/6

**N**

name [1]  27/24
narrative [1]  45/17
National [1]  7/11
nature [2]  26/9 45/18
Neblett [33]
necessary [1]  31/10
needlessly [1]  42/13
neither [3]  17/10 26/17 33/11
newly [1]  7/11
Nice [1]  58/24
Nodding [1]  56/10
none [1]  30/16
North [2]  25/25 26/11

note [3]  25/14 27/19 53/20
noted [1]  52/3
notes [1]  10/13
notice [4]  4/13 30/23 31/1 54/25
nowhere [1]  57/10
number [19]
Number 116 [1]  5/4
Number 116-1 [1]  6/9
Number 119 [3]  5/2 42/14 55/14
Number 119-1 [1]  43/11
Number 136 [1]  4/24
Number 174139 [1]  44/4
Number 3 [1]  19/12
Number 34 [1]  4/9
Number four [1]  14/14

**O**

oath [2]  46/5 46/11
object [3]  37/25 38/2 38/3
objection [4]  43/4 53/1 54/9 58/12
observations [1]  43/8
Oceans [1]  43/13
oddly [1]  46/18
Official [2]  2/9 59/24
offshore [1]  7/9
Oh [1]  39/24
omission [1]  26/19
open [1]  40/6
operate [1]  11/11
opine [11]  5/22 6/3 11/9 13/22 20/17
 35/2 44/15 45/12 47/11 50/20 53/7
opining [1]  16/1
opinion [54]
opinion' [1]  10/23
opinions [74]
opportunity [2]  29/9 44/16
opposing [2]  26/22 27/4
opposition [8]  31/20 31/23 32/4 37/16
 38/17 39/8 41/1 41/22
order [9]  4/23 17/5 21/25 26/23 38/21
 41/13 55/12 55/15 58/16
ordered [1]  8/25
original [1]  40/12
outlined [3]  6/7 8/15 13/20
outlines [1]  52/7
outright [1]  42/15
outweighed [2]  42/11 43/3
overall [1]  54/11
owe [1]  53/12

**P**

P.A [2]  2/2 2/5
p.m [3]  1/8 3/1 59/5
page [29]
pages [9]  10/21 25/5 39/17 44/6
 47/24 48/21 49/16 50/7 52/11
papers [1]  31/17
paragraph [14]
paragraph -- excuse [1]  5/19
paragraph 3 [1]  49/2
paragraph 38 [1]  44/19
paragraph 39 [1]  44/24
paragraph 40 [1]  45/5
Paragraph 41 [1]  45/10
paragraph 42 [1]  45/13

**P**

paragraph 5 [1]  44/2
paragraph 8 [1]  44/6
paragraphs [1]  4/9
part [9]  14/24 15/3 31/3 36/19 42/15
 51/10 53/14 55/14 55/15
parties [5]  4/12 8/9 37/22 50/23 54/11
parts [1]  6/21
party [1]  27/3
party's [2]  9/4 27/4
passenger [1]  7/25
pattern [1]  12/18
pay [4]  4/14 4/17 4/19 40/10
pendency [1]  15/17
pending [1]  57/7
people [1]  23/15
perceive [1]  19/3
percent [2]  36/22 37/5
perfectly [2]  49/19 54/3
period [2]  23/4 58/9
permissive [1]  28/2
permit [1]  50/23
permitted [4]  11/2 28/14 28/15 55/12
Perry [3]  2/5 56/6 56/22
person [1]  51/7
perspective [1]  31/11
persuaded [1]  24/16
phase [1]  42/25
photographs [2]  8/11 44/3
piece [2]  42/21 54/10
pieces [3]  13/12 25/10 54/21
place [4]  11/23 14/24 15/13 55/4
placement [1]  7/20
plaintiff [12]
plaintiff's [6]  5/1 5/3 42/7 46/6 46/12
 48/19
plaintiffs [4]  4/2 14/3 22/12 57/20
pleadings [1]  58/15
plenty [1]  43/5
point [12]
pointed [1]  40/14
policies [8]  6/13 6/15 7/12 20/8 20/13
 36/3 44/4 46/2
policy [73]
pop [1]  27/24
popping [1]  30/8
pops [1]  28/4
position [16]
positions [1]  15/3
posits [1]  13/17
possesses [1]  43/15
possibility [1]  58/4
post [14]
post-discovery [1]  40/7
post-incident [1]  8/10
post-loss [12]
postponing [1]  58/4
practice [9]  7/23 12/18 13/7 13/10
 27/22 27/25 38/5 38/8 39/3
practices [2]  11/10 11/22
practitioner [1]  7/21
pre [2]  16/7 21/7
precise [1]  13/6
preconditions [3]  16/6 16/8 17/6

preinsurance [1]  43/10
prejudice [8]  27/18 42/12 45/24 50/22
 52/25 53/21 54/14 55/19
prejudice.' [1]  47/12
prejudiced [1]  42/21
prejudices [2]  28/9 54/4
prejudicial [2]  43/3 46/24
prejudicing [2]  42/17 54/3
preliminary [8]  13/18 24/22 25/16 26/3
 26/9 27/15 35/6 53/22
prepare [1]  27/3
prepared [2]  9/1 45/10
PRESENT [2]  2/8
presented [2]  48/10 54/11
presenting [1]  42/13
presents [1]  46/18
prevail [1]  5/14
price [1]  15/6
primarily [1]  7/23
principles [1]  45/15
priority [1]  45/2
probative [2]  42/10 43/2
Procedure [1]  5/8
proceedings [3]  1/24 59/5 59/21
process [9]  6/5 6/6 8/14 8/21 13/19
 15/23 20/19 37/1 37/18
produced [4]  1/25 47/19 47/24 53/17
production [1]  32/23
professional [1]  44/9
proffer [1]  5/21
prominent [1]  8/3
promised [1]  50/6
prong [1]  46/13
proper [2]  41/11 54/8
properly [1]  48/10
proposed [1]  39/4
proposing [1]  49/6
provide [7]  5/9 8/24 9/3 14/12 14/25
 44/17 45/8
provided [11]  15/19 27/8 31/19 33/17
 44/6 44/14 44/20 51/4 52/3 52/13
 53/6
provides [3]  8/3 25/18 27/10
providing [1]  26/14
publications [2]  8/11 9/10
purchased [1]  23/2
purported [1]  46/13
pursuant [1]  59/19
push [2]  58/10 58/13
puts [1]  29/6

**Q**

qualification [1]  51/23
qualifications [1]  9/10
qualified [6]  45/19 45/22 46/8 47/10
 49/19 51/11
question [17]
question's [1]  14/19
questioning [1]  43/2
quote [1]  40/4
quoting [1]  25/7

**R**

raise [2]  43/3 53/1
raising [1]  54/8

range [1]  37/3
rank [1]  46/14
re [2]  25/21 39/3
re-engage [1]  39/3
reach [1]  46/13
reaches [1]  51/13
read [6]  17/1 18/2 18/20 19/13 27/19
 40/5
realized [1]  40/21
reasons [6]  9/7 11/6 25/3 25/12 27/14
 27/21
received [1]  49/12
recent [1]  4/1
recitation [1]  5/13
recommendation [1]  47/7
recommendations [23]
recommended [1]  45/9
record [4]  3/3 10/8 11/16 59/21
recorded [1]  1/24
referenced [1]  56/4
referred [1]  10/18
refile [1]  41/16
reflected [1]  50/9
regularly [1]  9/4
reinsurers [1]  12/19
reiterate [1]  40/9
rel [1]  51/18
relationships [1]  6/17
relevant [24]
reliability [1]  46/13
reliable [3]  45/15 47/20 51/14
relied [5]  31/23 32/1 32/4 38/21 48/19
relief [1]  4/18
reluctant [1]  33/12
rely [2]  37/10 48/22
relying [5]  13/13 32/21 32/21 37/15
 38/7
remember [2]  29/13 31/5
remind [1]  58/7
render [1]  43/8
renders [1]  44/7
reopen [1]  37/14
rep [7]  18/24 19/21 20/22 22/17 45/20
 46/6 46/12
repairs [3]  6/19 6/20 44/23
replaced [2]  41/8 41/8
replacement [1]  6/20
reply [8]  10/17 10/21 14/10 14/23
 31/18 48/14 48/21 56/4
report [59]
Reporter [3]  2/9 2/9 59/24
reports [3]  8/8 25/20 26/6
representations [2]  52/10 52/13
representative [1]  36/16
representatives' [1]  11/10
represented [1]  9/25
requested [3]  36/10 36/15 45/6
requests [1]  47/14
required [6]  17/24 19/6 23/20 27/5
 44/17 49/17
requirements [15]
requisite [1]  46/11
resolution [1]  5/4
resolve [2]  57/12 57/19
resources [1]  26/25

**R**

response [13]
rest [1] 47/20
result [1] 39/3
retained [3] 6/11 9/2 43/7
returning [1] 33/17
review [8] 8/6 11/7 44/7 45/25 47/24
  49/7 54/25 56/2
reviewed [13]
reviewing [1] 12/18
ripe [1] 5/4
risk [2] 13/1 45/5
risks [3] 7/20 44/4 46/22
RKA [1] 1/4
RMR [2] 2/9 59/24
RMR-CRR [1] 59/24
rob [1] 29/9
Rodriguez [1] 27/2
Rodriguez vs. Scottsdale [1] 27/2
Room [1] 2/10
Rosenbaum [1] 26/2
Roy [1] 1/17
rule [20]
Rule 26 [13]
Rule 403 [1] 42/10
Rule 7.1 [2] 31/5 55/3
ruling [4] 3/19 24/24 55/22 57/21
rulings [3] 28/3 57/6 57/12

**S**

safety [3] 7/14 7/16 45/2
Salopek [3] 2/9 59/23 59/24
salvage [2] 6/18 7/25
satisfied [2] 51/21 52/19
satisfy [1] 4/19
saw [1] 49/13
school [3] 7/7 7/18 43/21
Science [1] 43/15
scientific [2] 5/16 51/16
scientifically [1] 45/15
Scottsdale [1] 27/2
SE [2] 1/7 3/6
sea [1] 7/9
seaman [1] 51/24
Seamanship [1] 43/21
seaworthiness [1] 6/18
second [11] 4/15 8/23 13/18 18/19
  27/25 30/2 32/24 42/15 52/6 56/12
  56/12
Section [1] 59/19
see or [1] 29/21
seeking [1] 4/18
Senior [1] 48/11
sense [9] 13/14 16/8 28/25 31/11
  31/22 31/24 42/2 58/7 58/16
sentence [2] 24/3 24/4
Service [1] 7/12
settlement [1] 57/17
short [2] 27/9 54/12
shorten [1] 26/24
sic [2] 12/9 45/7
side [7] 12/19 20/9 36/4 36/4 41/23
  42/21 58/17
signed [2] 9/1 44/21

significance [1] 48/20
simple [1] 52/7
sketchy [1] 26/8
Small [1] 43/18
sought [2] 4/7 48/4
sound [1] 28/11
SOUTHERN [3] 1/2 25/23 26/1
special [2] 13/1 44/4
specialized [2] 5/17 51/17
specializes [1] 49/10
specially [1] 9/2
specific [6] 10/5 12/24 13/12 28/14
  44/12 52/12
specifies [2] 8/5 48/8
specify [1] 25/9
speculation [2] 45/17 46/14
spend [1] 58/14
spent [2] 7/8 53/3
stand [1] 18/24
standard [2] 42/9 43/22
standards [1] 6/13
state [8] 5/15 5/18 9/18 9/19 9/22 10/8
  28/16 28/19
stated [4] 5/15 31/21 44/10 47/23
statement [7] 4/9 4/16 9/5 9/13 9/20
  11/5 48/22
statements [4] 10/18 11/8 11/12 52/9
statements/waiver [1] 11/12
states [9] 1/1 1/18 2/10 8/3 10/22
  11/11 27/6 37/12 59/20
static [1] 29/14
statutes [1] 8/12
stay [1] 29/14
stenography [1] 1/24
step [9] 18/19 21/22 22/11 32/16
  32/24 32/24 32/25 37/18 49/24
steps [14]
Stetler [12]
sticker [2] 36/14 36/19
stipulate [2] 14/22 47/5
stipulated [6] 4/9 8/25 14/3 14/11
  24/21 28/18
stipulating [1] 18/12
storage [1] 6/19
strenuously [2] 37/24 38/1
stricken [11] 28/23 29/10 39/9 40/16
  41/7 42/23 47/3 47/15 49/1 53/23
  55/11
strictures [1] 54/15
study [1] 9/14
stuff [4] 13/7 17/15 18/6 34/11
subject [4] 5/22 8/16 13/22 51/8
subjective [1] 45/16
submit [2] 54/20 56/20
submitted [7] 9/25 27/9 38/8 38/18
  39/7 40/7 41/1
subsequent [1] 41/9
substantially [2] 42/11 43/3
subtracted [1] 30/8
sued [1] 4/17
suffering [1] 26/19
suffice [1] 26/4
sufficiency [1] 15/18
sufficient [3] 5/25 13/11 14/1
sufficiently [2] 26/24 51/14

suggest [1] 51/4
Suite [2] 2/3 2/6
summarize [1] 9/9
summary [19]
super [1] 52/23
supplement [2] 38/22 40/23
supplemental [1] 3/25
supplementation [2] 26/20 37/9
supplemented [2] 26/14 41/6
support [5] 9/9 47/19 47/25 52/13
  53/7
supported [2] 40/13 41/11
surplus [1] 12/23
surplusage [1] 20/6
surprise [2] 29/24 30/9
surrounding [1] 43/8
survey [20]
survey' [1] 6/15
Survey's [2] 52/14 55/21
surveying [1] 6/15 43/19 44/1
surveyor [3] 43/24 45/10 51/25
surveyors [1] 6/23
surveys [1] 8/8
systems [1] 45/2

**T**

T, [1] 26/11
take [7] 5/5 11/1 23/22 26/16 50/14
  55/4 59/3
taken [1] 23/12
talk [5] 8/23 28/6 31/3 34/23 57/10
talked [1] 29/2
talking [7] 18/14 19/11 32/13 32/22
  36/8 39/21 39/24
tasks [1] 48/4
technical [2] 5/17 51/17
tell [7] 23/25 27/23 42/24 46/15 52/18
  55/2 55/8
telling [1] 29/17 55/1
temporary [11] 15/12 15/13 15/15
  15/20 16/20 18/18 33/21 44/4 44/18
  53/12 53/13
term [1] 18/5
terms [3] 4/11 18/14 24/8
testified [2] 9/12 45/21
testify [11] 6/11 45/22 48/16 49/11
  49/12 50/3 50/24 51/11 52/4 55/16
  55/19
testimony [21]
Thank [9] 4/6 29/5 42/3 57/1 58/19
  58/21 58/23 58/24 59/1
thereof [2] 6/14 8/8
they'd [1] 54/7
think [61]
thinks [4] 17/18 32/16 39/2 51/7
thought [4] 15/18 35/5 38/5 40/16
thoughts [1] 3/18
thousands [1] 52/11
three-part [1] 51/10
three-step [1] 32/25
three-week [1] 58/3
thus [4] 10/24 26/25 45/12 46/23
tie [1] 28/18
tied [1] 21/24
time [24]

**T**

timing [1]  36/25
Title [1]  59/20
total [3]  23/8 24/22 30/6
totalling [1]  44/5
totally [2]  41/2 41/7
touch [1]  29/2
touches [1]  10/19
towing [1]  6/18
training [1]  44/9
transaction [1]  19/25
transcript [3]  1/16 1/24 59/21
trial [24]
trier [6]  5/11 47/17 48/3 51/16 52/1
 52/20
tries [1]  46/15
triggers [1]  31/2
true [9]  14/5 14/19 16/23 17/7 20/3
 25/4 36/9 38/11 59/20
two-step [1]  37/18

**U**

U.S. [3]  7/14 43/13 43/16
U.S. Coast [2]  7/14 43/13
U.S. Merchant [1]  43/16
Uhm [1]  35/7
unable [1]  45/7
unassailable [1]  47/23
unchallenged [1]  48/11
unclear [1]  39/14
underlying [2]  30/12 38/23
understand [14]
understanding [1]  15/16
underwriter [3]  5/25 14/14 48/12
underwriters [1]  45/4
underwriting [7]  6/13 6/13 8/7 45/23
 49/14 50/20 55/18
undisclosed [1]  45/11
unfair [1]  42/12
Unfortunately [1]  57/15
Ungaro [1]  26/12
unhelpful [3]  46/18 46/22 46/24
UNITED [7]  1/1 1/18 2/10 8/3 11/11
 43/14 59/20
unless [4]  8/24 29/16 31/10 55/12
Unlimited [1]  43/13
unqualified [2]  46/2 50/20
unrelated [3]  5/23 8/17 13/23
unrepaired [1]  45/3
unsupported [1]  45/17
unwilling [1]  45/7
upfront [1]  36/7
us [11]  8/13 27/12 36/1 38/14 38/20
 39/19 45/8 52/18 53/11 56/24 57/12
Usher [1]  48/11

**V**

vague [2]  26/8 27/11
value [15]
values [1]  6/21
vendors [1]  45/8
vessel [16]
vessels [1]  7/21
view [2]  11/1 52/13

violates [1]  43/1
void [2]  15/15 45/12
volition [1]  40/19
voluminous [1]  47/18
vs. [3]  25/25 26/11 27/2

**W**

wait [3]  30/20 56/12 56/12
waiting [1]  57/21
waive [1]  30/20
waiver [1]  11/12
WEDNESDAY [1]  2/13
week [4]  23/2 28/11 54/24 58/3
weeks [3]  29/14 38/20 54/16
welcome [1]  53/1
West [1]  2/3
whatsoever [1]  57/16
whichever [1]  32/18
who's [3]  3/9 3/12 18/24
Wilcox [2]  12/5 13/1
window [2]  55/8 55/10
wish [1]  5/14
with,' [1]  10/3
witness [10]  5/9 9/2 9/2 9/6 9/8 9/12
 11/5 46/7 46/8 49/1
witness's [1]  9/9
Witnesses [1]  8/24
WL [4]  25/22 25/25 26/12 27/2
word [3]  38/2 40/23 40/24
wording [2]  30/4 30/7
words [6]  17/18 24/19 30/7 30/8 37/13
 50/13
work [8]  11/24 20/2 20/9 29/4 45/9
 55/9 56/6 58/17
worked [9]  7/11 7/19 12/18 12/20 20/7
 43/24 56/7 56/22 57/2
working [2]  36/3 58/14
works [4]  12/21 19/23 20/11 20/14
worry [3]  42/18 42/20 53/25
worth [1]  14/15
writes [1]  25/15
written [4]  8/24 9/1 46/18 46/20
wrong [2]  24/16 56/6

**Y**

Yacht [2]  43/18 43/22
yard [1]  6/18
Yep [1]  4/5

**Z**

Zoom [2]  1/16 3/2